2021 IL App (1st) 191962

No. 1-19-1962

Fourth Division
March 31, 2021

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| | ) | |
| FITZGERALD MULLINS and JOHN DOYLE, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| | ) | Nos.   2017 L 012175 |
| v. | ) |          2018 L 004059 |
| | ) |          (cons.) |
| TIMOTHY C. EVANS, Individually and as Chief Judge | ) | |
| of the Circuit Court and Administrator of the Juvenile | ) | The Honorable |
| Temporary Detention Center of Cook County, Illinois; | ) | Moira S. Johnson, |
| BRUCE BURGER; LEONARD B. DIXON; and | ) | Judge Presiding. |
| DIANE McGHEE, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Delort and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1      Plaintiffs Fitzgerald Mullins and John Doyle, both employees of the Cook County Juvenile Temporary Detention Center (JTDC), were disciplined for reporting to the sheriff's office that they had observed what appeared to be a gun in a bag passing through the X-ray scanner at the entrance of the JTDC. Each plaintiff filed a lawsuit, which was later consolidated with the other, naming as defendants Leonard Dixon, the JTDC superintendent; Diane McGhee, the JTDC deputy superintendent; Bruce Burger, the JTDC hearing officer (collectively, the JTDC defendants); and Timothy Evans, administrator of the JTDC and chief judge of the circuit court

of Cook County (chief judge). The complaints contained five counts, including both constitutional and statutory claims, as well as a count for civil conspiracy against the JTDC defendants. All defendants filed motions to dismiss, and the trial court dismissed all claims against the chief judge and the constitutional and conspiracy claims against the JTDC defendants, leaving only the statutory claims. Plaintiffs now appeal the dismissal of each of the counts, and for the reasons that follow, we affirm.

¶ 2                                  BACKGROUND

¶ 3      As noted, plaintiffs each individually filed suit against defendants, and the suits were ultimately consolidated on July 5, 2018. Each plaintiff amended his complaint several times, and it is Doyle's second amended complaint and Mullins' third amended complaint, both filed March 28, 2019, that were the subjects of the motions to dismiss at issue. As these complaints are largely identical, we discuss them together, unless circumstances require otherwise. Additionally, as the complaints were dismissed pursuant to a motion to dismiss, all facts are taken from the complaints and the exhibits attached thereto, unless otherwise noted.

¶ 4      Plaintiff Doyle is a " 'Security Specialist,' " employed at the JTDC, while plaintiff Mullins is Doyle's direct supervisor and "supervisor-in-charge ('SIC') of the JTDC security unit." Doyle is a member of a union, and his employment is subject to a collective bargaining agreement, while Mullins has been a career service employee of the JTDC since 1992. According to Doyle's complaint, "DOYLE was responsible for the JTDC's security unit, and responsible for JTDC compliance with all laws, ordinances, and rules. The safety and security of both the children placed there and that of the JTDC's employees is one of the primary purposes of DOYLE's job and of the JTDC." Specifically, on October 7, 2017, the date of the incident in question, "DOYLE's assignment included securing the JTDC against persons

2

unlawfully bringing in firearms to the facility including its residential areas." Similarly, Mullins' complaint alleged that on October 7, 2017, "MULLINS' duties included among other things, the duty to secure the safety of the JTDC."

¶ 5     On October 7, 2017, Doyle was working the X-ray scanning machine at the entrance to the JTDC, which was used by security employees to examine all bags and garments for contraband for all persons entering the facility, including staff. Like all the JTDC security staff, Doyle was not armed and did not possess police powers. Therefore, he could not stop someone with a gun but could report it to his supervisors and, under certain circumstances, to the deputy sheriff. At approximately 6:45 a.m., a JTDC senior supervisor entered the JTDC building and proceeded through the X-ray screening machine, placing her handbag on the belt for scanning. As the bag went through the scanner, the scanner "buzzed and lit up." According to Doyle's complaint, the image on the scanner "showed the outline of a handgun and of an official badge or star in the purse." Doyle went to Mullins, his supervisor, and gave him a copy of the scan. The senior supervisor was asked whether she was bringing a firearm into the facility, "and she answered 'no' and left the area." A different security officer went from the scanning area to the senior supervisor's office and asked her to return to the screening area with her handbag. After a delay of at least seven minutes, the senior supervisor returned and again placed her handbag on the belt to be scanned. However, the new image no longer showed either a firearm shape or a star shape. She then left the screening area and later exited the building.

¶ 6     Doyle's complaint alleged that deputy sheriffs provide armed security and have responsibility for all law enforcement within the JTDC. Doyle's complaint further alleged that "JTDC General Work Rule 8 required DOYLE, among other things, to report 'all unusual incidents to his/her immediate supervisor.' " After the second scan, "[f]ollowing JTDC

policy," Doyle informed Mullins of the differences he observed between the two images produced by the scanner and further informed Mullins that he believed that the senior supervisor had improperly and unlawfully carried a gun into the JTDC. Mullins obtained the copies of the two scans from Doyle and agreed that the first scan showed the image of a gun. He notified the sheriff's office, at which time a deputy sheriff completed a "law enforcement report" that included a notation that a firearm had been illegally brought into the JTDC.

¶ 7    At approximately the same time, defendant Dixon personally intervened and took over the JTDC's investigation, stating that he had concluded that the image in the original scan was of a sunglass case. Normally, there were several JTDC employees—not including Dixon—who would work with Mullins, the on-duty security officer in charge, and Doyle to conduct an investigation. However, in this case, Dixon conducted an investigation alone, and no other employees were involved in the investigation. Additionally, normally, there were certain investigatory steps that should have been taken to corroborate Dixon's conclusion that the image was a sunglass case, not a gun, including (1) inventorying the sunglass case, (2) taking a photo of it, or (3) "reproducing an x-ray scan substantiating that the sunglass case's image in the x-ray was not, in fact, a firearm." This evidence would be kept in an investigation file maintained by the JTDC. However, Dixon did not follow any of these investigation steps.

¶ 8    The complaints further alleged that, as security officer in charge on October 7, 2017, protocol required Mullins and his security team to participate in all aspects of the investigation begun when Mullins reported the incident. However, Mullins and Doyle were excluded from all aspects of the investigation. Additionally, the complaints alleged that, "[a]bsent good cause and acting so as to obstruct justice," Dixon or one of his deputies informed the sheriff's office that a sunglass case, not a firearm, had been brought into the JTDC and further made the

"unusual request" that the sheriff's office not investigate Mullins and Doyle's initial statements or even make a report. Dixon also demanded that Mullins communicate to the staff that the item in the scan was a sunglass case, not a firearm, and Mullins did so "under duress, to avoid facing a claim of insubordination."

¶ 9 Doyle's complaint alleged that Dixon initiated disciplinary proceedings against Doyle and Mullins, charging Doyle for violations of " 'General Work Rules' and 'Employee Safety.' "[1] He also subsequently approved a 20-day suspension without pay for Doyle, "despite knowing that DOYLE had properly performed his duties and was protected by law in both his actions and his communications." Doyle's complaint alleged that Dixon's actions were done in retaliation "for embarrassing DIXON's leadership at the JTDC, since DIXON and his executive staff viewed DOYLE as a political ally of SIC Mullins, who was a competitor of DIXON's for the Superintendent's position." Doyle's complaint further alleged that Dixon was also motivated to retaliate against Doyle "from a desire to deter DOYLE and others from future whistleblowing and to undermine DOYLE's credibility and to prevent the incident from becoming public knowledge or reaching independent law enforcement." Doyle's complaint alleged that "DIXON was upset and angry that word had gotten out about the gun and misconduct at the JTDC to the law enforcement community at the facility and ordered that DOYLE be charged with rule violations so DOYLE could be publicly punished."

¶ 10 Doyle's complaint also alleged that a " 'pre-disciplinary' hearing" was set before defendant Burger on October 19, 2017, with defendant McGhee's approval, which was when he also received notice of the charges against him. Doyle's complaint alleged that Burger's conduct in other proceedings had been found to "fail to provide even minimal due process and to be

---

[1] The record does not contain any further explanation of these rules.

nothing but a rubber stamp for the JTDC administration." Doyle's complaint further alleged that it was the chief judge's policy and practice to allow Dixon, his appointee, through Burger, "to hold rump court arbitration and disciplinary hearings" and that the chief judge knew or should have known that, under Dixon, the JTDC was not providing its employees with constitutionally appropriate hearings. Specifically, in his hearing, Doyle's complaint alleged that Doyle had no right (1) to confront the witnesses against him, (2) to receive a list of charges or supporting evidence, (3) to conduct discovery, (4) to call witnesses, (5) to an attorney, (6) to cross-examine witnesses, or (7) to subpoena witnesses on his own behalf. Doyle's complaint alleged that both Burger and McGhee had the opportunity to view the X-ray scans "and knew the images were physical evidence corroborating Mullins' and DOYLE's beliefs in good faith that a gun had unlawfully entered the JTDC and such evidence fully justified DOYLE and Mullins' actions that day and thereafter were appropriate and not deserving of any discipline."

¶ 11    Mullins' complaint contained similar allegations, alleging that Dixon initiated disciplinary proceedings against him and subsequently approved a one-day suspension without pay. As in Doyle's complaint, Mullins' complaint alleged that Dixon did so in retaliation for embarrassing JTDC leadership and to undermine Mullins' credibility and that the hearing did not afford Mullins numerous rights. Mullins' complaint further alleged that Dixon "has continued to initiate further disciplinary action against MULLINS in retaliation for MULLINS' making a law enforcement report, the latest act to date occurring on January 23, 2019, a 15-day suspension without pay."

¶ 12    Each complaint contained five counts. Count I was against all defendants, for violation of plaintiffs' first amendment rights. Count II was against all defendants, for violation of plaintiffs' due process rights. Count III was against the JTDC defendants, for civil conspiracy.

Count IV was against all defendants, for violation of the State Officials and Employees Ethics Act (Ethics Act) (5 ILCS 430/1-1 *et seq.* (West 2016)). Count V was against all defendants, for violation of the Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2016)).

¶ 13    Attached to the complaints were several exhibits. First, there was a series of three photographs. The first appears to depict a sign on a door showing that guns are not permitted. The second purports to be an image of the first scan of the senior supervisor's bag. The image, which is in color, shows the outline of a bag, with a number of items contained within the bag. In the bottom righthand corner of the bag appears to be a dark object. The object appears to be in the shape of a capital "T," with the vertical bar located slightly to the right of center and with the vertical bar being slightly shorter than the horizontal bar. Underneath the dark object is a lighter-colored object that is partially obstructed by the dark object but appears to have several star-shaped points. The third photograph, which purports to be an image of the second scan of the senior supervisor's bag, does not appear to contain the dark "T-shaped" object, nor does it appear to contain an object that has star-shaped points.

¶ 14    Also attached to the complaints were several orders from arbitration hearings and hearings before the state panel of the Illinois Labor Relations Board concerning the JTDC's disciplinary procedures in other situations, as well as the first pages of two newspaper articles about the October 7, 2017, incident and the first page of a collective bargaining agreement between the office of the chief judge and Teamsters Local Union No. 700.

¶ 15    On May 13, 2019, the chief judge filed a combined motion to dismiss both complaints under section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2018)). The chief judge claimed that counts I and II should be dismissed under section 2-615

of the Code (735 ILCS 5/2-615 (West 2018)) because they failed to state a cause of action.[2] Specifically, the chief judge claimed that count I should be dismissed because plaintiffs did not allege that their reports were made in their capacity as private citizens, and that count II should be dismissed because plaintiffs failed to allege that they had a protected property interest in continued employment at the JTDC. Additionally, the chief judge claimed that counts II through V should be dismissed under section 2-619 of the Code (735 ILCS 5/2-619 (West 2018)). Specifically, the chief judge claimed that count II should be dismissed on the basis of sovereign immunity, count IV should be dismissed because plaintiffs were not " 'State employees' " as defined by the Ethics Act, and count V should be dismissed because it was barred under the State Lawsuit Immunity Act (745 ILCS 5/0.01 *et seq.* (West 2016)).[3]

¶ 16    On the same day, the JTDC defendants also filed a combined motion to dismiss both complaints under section 2-619.1 of the Code, raising substantially similar arguments as contained in the chief judge's motion to dismiss. Specifically, the JTDC defendants claimed that counts I, II, III, and V should be dismissed under section 2-615 because plaintiffs failed to allege that their reports were made in their capacity as private citizens rather than as part of their ordinary work duties (count I), because plaintiffs had no property interest in their continued employment (count II), because plaintiffs failed to plead sufficient facts to establish a conspiracy (count III), and because plaintiffs failed to plead facts to support a violation of the Whistleblower Act (count V). Additionally, the JTDC defendants claimed that counts I, II, and IV should be dismissed under section 2-619. The JTDC defendants claimed that counts I

_____

[2] The chief judge also claimed that count III should be dismissed under section 2-615 of the Code, but this count was not directed at the chief judge.

[3] Again, the chief judge also claimed that count III should be dismissed under section 2-619 of the Code, but this count was not directed at the chief judge.

and II should be dismissed on the basis of sovereign immunity, and that count IV should be dismissed because plaintiffs cannot sue judicial employees under the Ethics Act.

¶ 17    In response, plaintiffs claimed that the chief judge was not acting in a judicial capacity when acting as the administrator of the JTDC but was acting as a county official exercising nonjudicial power and, consequently, he and the employees of the JTDC were county, not state employees. Accordingly, plaintiffs claimed that sovereign immunity was not applicable and that the Ethics Act applied to defendants' conduct. Moreover, if defendants were state employees, plaintiffs claimed that the legislature waived sovereign immunity with respect to the Ethics Act. Plaintiffs also claimed that their reports were made in their capacity as private citizens, not as part of their work, and that they had protectable property interests in their continued employment—Doyle through the collective bargaining agreement and Mullins by virtue of his long-standing employment. Plaintiffs further claimed that the Ethics Act itself provided them with a protectable property interest in their employment through its prohibition against retaliation. Plaintiffs also claimed that the State Lawsuit Immunity Act did not bar their Whistleblower Act claims against the chief judge. Finally, plaintiffs claimed that they had alleged sufficient facts to support each of their claims and that, without discovery, plaintiffs could not provide more specific details establishing a conspiracy.

¶ 18    Attached to plaintiffs' response were a number of documents,[4] including the transcript of an April 23, 2018, interview conducted by plaintiffs' attorney of Jacqueline McCoy, a quality

---

[4] We note that the exhibits attached to the response may only be considered in the context of dismissal under section 2-619 of the Code. See 735 ILCS 5/2-619(c) (West 2018) (the nonmovant may present "affidavits or other proof denying the facts alleged or establishing facts obviating the grounds of defect" in response to a section 2-619 motion to dismiss). However, as these exhibits are not attached to plaintiffs' complaints, they are not properly considered in evaluating a motion to dismiss under section 2-615. See *Cwikla v. Sheir*, 345 Ill. App. 3d 23, 29 (2003) (in ruling on a section 2-615 motion to dismiss, "the court may not consider affidavits, products of discovery, documentary evidence not incorporated into the pleadings as exhibits, or other evidentiary materials").

assurance and compliance analyst at the JTDC. McCoy stated that she "[did not] have a lot of confidence in the process" for hearings at the JTDC because they did not afford the employees due process and the superintendent and assistant superintendent "probably have more influence than they should" on the process. McCoy further stated that, on one occasion, Dixon came into her office and, during the course of their conversation, made derogatory comments concerning Mullins, which McCoy found "shock[ing]."

¶ 19    Also attached to the response was an arbitrator's ruling, in a different case, sustaining a grievance as to a JTDC employee's termination, in which the arbitrator found that Burger's determination that there was just cause to discipline the employee was erroneous, as well as documents concerning a different arbitration, in which an employee was found to have been subject to disciplinary actions due to retaliation. Plaintiffs also attached a statement of contributions, showing the sum held in the County Employees' and Officers' Annuity and Benefit Fund of Cook County on behalf of Mullins, and a paystub for Doyle.

¶ 20    Plaintiffs also later supplemented their response with another exhibit, consisting of the sworn statement of James Wrightsell Jr., which was taken by plaintiff's counsel on August 1, 2019. Wrightsell, who was employed by the JTDC in the office of professional standards and responsibilities (OPR), stated that, normally, OPR would have investigated plaintiffs' report but that, in this case, Dixon conducted his own investigation and OPR was not involved until several weeks later. Wrightsell stated that, in his opinion, the object in the X-ray scan appeared to be a gun and that, if OPR was conducting the investigation, they would have inventoried the sunglass case and taken photos of it, which was not done. Wrightsell further stated that he was familiar with both Mullins and Doyle; Mullins had a reputation of being a "straight shooter," while Wrightsell found Doyle to be forthcoming and truthful when he interviewed him after

the incident. Wrightsell also stated that it was "common knowledge" that Mullins was interested in becoming JTDC superintendent.

¶ 21    On September 9, 2019, the trial court entered an order granting in part and denying in part the motions to dismiss, as follows: (1) the court dismissed all counts against the chief judge with prejudice, with counts I and II being dismissed pursuant to section 2-615 of the Code and counts IV and V being dismissed pursuant to section 2-619 of the Code, (2) the court dismissed counts I, II, and III against the JTDC defendants with prejudice pursuant to section 2-615 of the Code, and (3) the court denied the JTDC defendants' motion to dismiss with respect to counts IV and V. The court also found that there was no just reason for denying enforcement or appeal of its order. This appeal follows.

¶ 22                                ANALYSIS

¶ 23    On appeal, plaintiffs challenge the dismissal of their entire complaints against the chief judge, as well as the dismissal of counts I, II, and III against the JTDC defendants. In the case at bar, defendants filed combined motions to dismiss pursuant to section 2-619.1 of the Code, which permits a party to file a motion to dismiss based on both section 2-615 and section 2-619 of the Code. 735 ILCS 5/2-619.1 (West 2018). We take the same approach to our analysis as the trial court below did: we first address dismissal under section 2-615 for each count, then proceed, as necessary, to considering dismissal under section 2-619.

¶ 24                             I. Section 2-615

¶ 25    In the case at bar, the trial court dismissed counts I, II, and III of plaintiffs' complaints pursuant to section 2-615 of the Code. A motion to dismiss under section 2-615 of the Code challenges the legal sufficiency of the complaint by alleging defects on its face. *Young v. Bryco Arms*, 213 Ill. 2d 433, 440 (2004); *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003). The critical

inquiry is whether the allegations in the complaint are sufficient to state a cause of action upon which relief may be granted. *Wakulich*, 203 Ill. 2d at 228. In making this determination, all well-pleaded facts in the complaint and all reasonable inferences that may be drawn from those facts are taken as true. *Young*, 213 Ill. 2d at 441. In addition, we construe the allegations in the complaint in the light most favorable to the plaintiff. *Young*, 213 Ill. 2d at 441. We review *de novo* an order granting a section 2-615 motion to dismiss. *Young*, 213 Ill. 2d at 440; *Wakulich*, 203 Ill. 2d at 228. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 26                                   A. Count I—First Amendment

¶ 27        Count I of the complaints, against all defendants, was for violations of the first amendment and alleged that defendants impermissibly retaliated against plaintiffs' exercising their right to freedom of speech in reporting the incident to the sheriff's office. The United States Supreme Court has made clear that public employees do not surrender all of their first amendment rights by reason of their employment. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Instead, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417.

¶ 28        Recognizing that there is a tension between promoting the individual and societal interests that are served when employees speak as citizens on matter of public concern on the one hand, and respecting the needs of governmental employers attempting to perform their important public functions on the other, the Supreme Court has established a framework to be applied in

12

such cases. *Garcetti*, 547 U.S. at 420; *Lane v. Franks*, 573 U.S. 228, 236 (2014). This consists of "two inquiries to guide interpretation of the constitutional protections accorded to public employee speech." *Garcetti*, 547 U.S. at 418.

> "The first requires determining whether the employee spoke as a citizen on a matter of public concern. [Citation.] If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. [Citation.] If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. [Citation.]" *Garcetti*, 547 U.S. at 418.

See also *Lane*, 573 U.S. at 237 (discussing same two questions).

¶ 29    In the case at bar, the trial court found that plaintiffs failed to allege sufficient facts to support a first amendment claim, and we agree. As noted, the first step in the first amendment analysis is to determine whether the employee spoke as a private citizen on a matter of public concern. *Garcetti*, 547 U.S. at 418. Here, the allegations of plaintiffs' complaints establish that their conduct in reporting the suspicious X-ray scan was done in the course of their employment, not as private citizens. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

¶ 30    With respect to Doyle, it is inescapably clear that his report was made in the course of his official duties. Doyle was working the scanner, observed a suspicious object, and reported it to Mullins, his supervisor. According to Doyle's complaint, "DOYLE was responsible for the

JTDC's security unit, and responsible for JTDC compliance with all laws, ordinances, and rules. The safety and security of both the children placed there and that of the JTDC's employees is one of the primary purposes of DOYLE's job and of the JTDC." Specifically, on October 7, 2007, the date of the incident in question, "DOYLE's assignment included securing the JTDC against persons unlawfully bringing in firearms to the facility including its residential areas." Doyle's complaint further alleged that "JTDC General Work Rule 8 required DOYLE, among other things, to report 'all unusual incidents to his/her immediate supervisor' " and that, after the second scan, "[f]ollowing JTDC policy," Doyle informed Mullins of the differences he observed between the two images produced by the scanner and further informed Mullins that he believed that the senior supervisor had improperly and unlawfully carried a gun into the JTDC. There is no indication that Doyle's conduct in reporting what he observed was anything other than a report made in the course of his official duties.

¶ 31    Similarly, Mullins' conduct consisted of his reporting Doyle's findings to a deputy sheriff. Mullins' complaint alleged that on October 7, 2017, "MULLINS' duties included among other things, the duty to secure the safety of the JTDC." Reporting a possible security breach to the sheriff's office—the agency that was responsible for providing all law enforcement within the JTDC, according to Doyle's complaint—falls squarely within that duty, regardless of whether the sheriff's office was technically a separate agency. We thus cannot find that Mullins' report was made in his capacity as a private citizen, but instead we must conclude that it was made pursuant to his responsibilities as supervisor in charge at the JTDC.

¶ 32    We do not find plaintiffs' arguments to the contrary to be persuasive. First, plaintiffs claim that the "*Garcetti* defense" is an affirmative defense that defendants have the burden to prove. It is true that a defendant has the burden to plead and prove its affirmative defenses. See

14

*Monson v. City of Danville*, 2018 IL 122486, ¶ 23. However, plaintiffs have provided no authority for the proposition that the law set forth in *Garcetti* is in the nature of an affirmative defense, and we cannot find that it is. Rather, *Garcetti* sets forth the fundamental elements of a first amendment claim in the context of public employee speech—indeed, the *Garcetti* Court made clear that, if the employee did not speak as a citizen on a matter of public concern, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418; see also *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009) ("the plaintiff bears the burden of showing the speech was spoken in the capacity of a private citizen and not a public employee").

¶ 33    Next, plaintiffs attempt to use the exhibits attached to their response to the motions to dismiss in support of their claim that their reports were made as private citizens, not as employees. However, as noted above, a section 2-615 motion is limited to the pleadings, and we may not consider any evidentiary materials not attached to the pleadings themselves. See *Cwikla*, 345 Ill. App. 3d at 29 (in ruling on a section 2-615 motion to dismiss, "the court may not consider affidavits, products of discovery, documentary evidence not incorporated into the pleadings as exhibits, or other evidentiary materials"). Accordingly, we cannot consider any such materials, including the statements of McCoy and Wrightsell, in considering dismissal under section 2-615. Moreover, plaintiffs' use of these exhibits conflates Doyle's report and Mullins' when, as discussed above, their conduct was distinct—Doyle reported the incident to Mullins, while Mullins reported it to the sheriff. Thus, even if plaintiffs' exhibits were relevant to the scope of Mullins' duties, they would not apply to Doyle, who reported the problem to his direct supervisor and who alleged that he did so "[f]ollowing JTDC policy."

¶ 34    Finally, we find no similarities between the instant case and the cases cited by plaintiffs. Plaintiffs suggest that their conduct is similar to those of cases in which public employees were found to have engaged in constitutionally protected speech. However, none of those cases presents a situation remotely comparable to the conduct at issue in the case at bar. For instance, in *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 793 (7th Cir. 2016), a part-time police officer whose duties involved traffic enforcement and placing calls for public service and officer back-up was found to be speaking as a private citizen when he reported concerns about superior officers voiding certain citations to other officers and to the FBI. The Seventh Circuit in that case noted that "[t]he fact that [the officer's] statements bore some relation to the subject matter of his job" was not dispositive. *Kristofek*, 832 F.3d at 793. Instead, the court looked to whether the officer was responsible for pursuing or voiding citations, or for determining when and under what circumstances arrestees could be released, and whether the officer had a duty to report his concerns. *Kristofek*, 832 F.3d at 793. Similarly, in *Chrzanowski v. Bianchi*, 725 F.3d 734, 740 (7th Cir. 2013), an assistant state's attorney was found to be speaking as a private citizen when he testified under subpoena regarding potential wrongdoing by his supervisor. Again, the Seventh Circuit focused on the duties of his employment, finding that "[t]he McHenry County State's Attorney's Office does not pay [the assistant state's attorney] to witness crimes and then testify about them; it pays him to prosecute crimes." *Chrzanowski*, 725 F.3d at 740.

¶ 35    In the case at bar, unlike in the cases cited by plaintiffs, plaintiffs' conduct did not merely "[bear] some relation to the subject matter of [their] job" (*Kristofek*, 832 F.3d at 793), but instead was central to their essential work duties. Both plaintiffs alleged that their duties involved securing the safety of the JTDC and, as noted, Doyle's complaint specifically alleged

16

that JTDC policy required him to report " 'all unusual incidents to his/her immediate supervisor,' " and he reported the suspicious scan to Mullins "[f]ollowing JTDC policy." Additionally, when presented with an apparent breach of the building's security, Mullins reported it to the entity responsible for law enforcement within the building—the sheriff's office. Thus, plaintiffs' conduct was entirely unlike that present in *Kristofek* or in *Chrzanowski*.[5] Accordingly, because plaintiffs were not speaking in their capacity as private citizens, the trial court properly dismissed count I pursuant to section 2-615 of the Code.

¶ 36                                    B. Count II—Due Process

¶ 37        Count II of the complaints, against all defendants, alleged that plaintiffs' due process rights were violated when they were not provided with an adequate hearing on the disciplinary charges. Specifically, the complaints alleged that, during their hearings, plaintiffs were afforded no right (1) to confront the witnesses against them, (2) to receive a list of charges or supporting evidence, (3) to conduct discovery, (4) to call witnesses, (5) to an attorney, (6) to cross-examine witnesses, or (7) to subpoena witnesses on their own behalf.

¶ 38        To plead a procedural due-process claim, a plaintiff must allege (1) a cognizable property interest, (2) a deprivation of that interest, and (3) a denial of due process. *Palka v. Shelton*, 623 F.3d 447, 452 (7th Cir. 2010). In the case at bar, defendants claim that plaintiffs cannot state a cause of action for due-process violations because they did not plead facts showing that plaintiffs had a cognizable property interest in their continued employment at the JTDC. Accordingly, to determine whether plaintiffs have stated a cause of action for due-process violations, we first consider whether they had any property right subject to protection. If

_____

[5] Plaintiffs also cite several unreported cases, including an unreported federal district court case, which we do not discuss.

plaintiffs have failed to allege a cognizable property interest, as defendants contend, then plaintiffs cannot state a cause of action, and we have no need to consider the sufficiency of the hearings that they were afforded.

¶ 39     Illinois is an employment-at-will state. *Harris v. Eckersall*, 331 Ill. App. 3d 930, 934 (2002) (citing *Barr v. Kelso-Burnett Co.*, 106 Ill. 2d 520, 525 (1985)). "It is settled that, absent legislative, administrative or contractual provisions to the contrary, a public employee in Illinois holds his office at the pleasure of the appointing power, which may remove him at any time." *Willecke v. Bingham*, 278 Ill. App. 3d 4, 10 (1996) (citing *Levin v. Civil Service Comm'n*, 52 Ill. 2d 516, 521 (1972)). Accordingly, generally, "the public employee has no property interest in continued employment so as to trigger Federal or State due process protections." *Willecke*, 278 Ill. App. 3d at 10; *Harris*, 331 Ill. App. 3d at 934.

¶ 40     Due-process claims in the context of public employment "require an entitlement to continued employment; more specifically, the plaintiff must have a legitimate claim of entitlement not to lose a valuable governmental benefit except for cause." (Internal quotation marks omitted.) *Palka*, 623 F.3d at 452. A property interest in continued employment can be created in one of two ways: (1) "by an independent source such as state law securing certain benefits" or (2) "by a clearly implied promise of continued employment." (Internal quotation marks omitted.) *Phelan v. City of Chicago*, 347 F.3d 679, 681 (7th Cir. 2003). A plaintiff alleging a due process violation bears the burden of demonstrating that he had a property interest in his job, arising either out of a statute or regulation or from a contract with a public entity. *Krieg v. Seybold*, 481 F.3d 512, 519 (7th Cir. 2007).

¶ 41     In the case at bar, plaintiffs argue that both Doyle and Mullins have protectable property interests in their continued employment. With respect to Doyle, he claims that he has a property

right in his employment because he is a union member protected by a collective bargaining agreement. A collective bargaining agreement can create an employment contract and, thus, a promise of continued employment in some cases. *Palka*, 623 F.3d at 452. However, plaintiffs' contention that "[t]he CBA contract alone constitutes a protectible property interest" is overly broad, and neither of the cases plaintiffs cite in support of that proposition even involves a collective bargaining agreement. See *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 535 (1985) (plaintiff was a " 'classified civil servant' " and thereby entitled to certain protections pursuant to Ohio law (quoting Ohio Rev. Code Ann. § 124.11 (1984)); *Slochower v. Board of Higher Education of New York City*, 350 U.S. 551, 554 (1956) (plaintiff was entitled to tenure under New York law and, therefore, entitled to certain protections). Instead, whether the collective bargaining agreement gave Doyle a property interest in continued employment turns on the language of the agreement itself. See *Minch v. City of Chicago*, 486 F.3d 294, 302 (7th Cir. 2007) ("Whether indeed the plaintiffs had a protected interest in working beyond the age of 63 is a question that, as both sides agree, turns on the language of the CBA."); *Krieg*, 481 F.3d at 520 (even in the presence of a collective bargaining agreement, where the agreement did not provide that employees may be discharged only for just cause, the plaintiff was an at-will employee who did not have a property interest in his job).

¶ 42    The problem in this case, however, is that Doyle has not identified any language in the collective bargaining agreement that gives him a property interest in his continued employment at the JTDC. "When a plaintiff alleges that the due-process entitlement arises from a collective-bargaining agreement, he must identify specific terms of the agreement that contained a promise of continued employment." *Palka*, 623 F.3d at 452. Doyle did plead that his employment was subject to a collective bargaining agreement, but he did not identify any

19

provision within the agreement that could give rise to a property interest in his continued employment. Indeed, Doyle did not even attach the entire collective bargaining agreement to his complaint[6] but included only the first page, so we cannot even review the terms of the agreement ourselves to determine if such a provision appears. Consequently, we cannot find that Doyle has adequately alleged that the collective bargaining agreement provided Doyle with a protectable property interest in his continued employment.

¶ 43      With respect to Mullins, who was not a union member, he claims that he has a protectable property interest in his employment by virtue of his long-standing employment with the JTDC. His claims are based on the United States Supreme Court's decision in *Perry v. Sindermann*, 408 U.S. 593, 601 (1972), in which the Supreme Court held that the absence of an employment contract did not necessarily foreclose the possibility that an employee has a property interest in employment. However, that case is entirely dissimilar to the situation present here.

¶ 44      In that case, the plaintiff had taught in the state college system in Texas for 10 years, under a series of one-year contracts. *Perry*, 408 U.S. at 594. The plaintiff filed suit after he was not offered a new contract for the next academic year, without being offered a statement of the reasons for the nonrenewal or an opportunity for a hearing to challenge the basis of the nonrenewal. *Perry*, 408 U.S. at 595. The Court found that the plaintiff's lack of formal contractual or tenured security in continued employment was "highly relevant" to his procedural due process claim but was not dispositive. *Perry*, 408 U.S. at 599. The Court noted that the plaintiff alleged that his interest in continued employment, "though not secured by a formal contractual tenure provision, was secured by a no less binding understanding fostered

_____

[6] While we are restricted to considering only the pleadings on a section 2-615 motion, we note that the entire collective bargaining agreement appears nowhere in the record on appeal but that excerpts are attached to plaintiffs' response to the motion to dismiss.

by the college administration." *Perry*, 408 U.S. at 599. Specifically, the plaintiff pointed to a "*de facto* tenure program" at the college, set forth in its faculty guide, which provided that the college had no formal tenure system but " 'wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work.' " *Perry*, 408 U.S. at 600. The plaintiff also pointed to guidelines promulgated by the Coordinating Board of the Texas College and University System, which provided that a person employed as a teacher in the college and university system for seven years or more had some form of job tenure. *Perry*, 408 U.S. at 600.

¶ 45    The *Perry* Court noted that property interests subject to procedural due process protections were not limited to rigid definitions but that "[a] person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry*, 408 U.S. at 601. The Court continued:

> "A written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient 'cause' is shown. Yet absence of such an explicit contractual provision may not always foreclose the possibility that a teacher has a 'property' interest in reemployment. For example, the law of contracts in most, if not all, jurisdictions long has employed a process by which agreements, though not formalized in writing, may be 'implied.' [Citation.] Explicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances.' [Citation.] And, '[t]he meaning of [the promisor's] words

and acts is found by relating them to the usage of the past.' [Citation.]" *Perry*, 408 U.S. at 601-02.

In the case before it, the Court found that a teacher, like the plaintiff, who had held his position for a number of years "might be able to show from the circumstances of this service—and from other relevant facts—that he has a legitimate claim of entitlement to job tenure." *Perry*, 408 U.S. at 602. The Court noted that there could be an "unwritten 'common law' " in a particular university that certain employees would have the equivalent of tenure and that that this was particularly likely in a college or university that had no explicit tenure system, such as in the college at which the plaintiff was employed. *Perry*, 408 U.S. at 602. Thus, the Court found that, "[i]n this case, the respondent has alleged the existence of rules and understandings, promulgated and fostered by state officials, that may justify his legitimate claim of entitlement to continued employment absent 'sufficient cause,' " and reversed the grant of summary judgment in favor of the school. *Perry*, 408 U.S. at 602-03.

¶ 46 In the case at bar, unlike in *Perry*, Mullins did not allege any "rules or understandings" that justify a claim of entitlement to continued employment with the JTDC. His claims are based merely on his long-standing employment and on the fact that he pays into the pension system. However, neither of these facts is remotely similar to the types of facts found relevant in *Perry*, such that they would entitle him to a property interest in his continued employment. Accordingly, we cannot find that Mullins has a property interest in his employment merely by virtue of the length of his service.

¶ 47 Plaintiffs also raise a number of other sources that they claim give rise to protectable property interests in their continued employment. First, they claim that the Ethics Act created a protected property interest due to its prohibition against retaliatory action in certain

circumstances. See 5 ILCS 430/15-10 (West 2018). However, nothing in the Ethics Act suggests that an employee is afforded a protectable property interest in continued employment due to the provisions of the statute, and we cannot create such a property interest.

¶ 48 Additionally, plaintiffs claim that they are entitled to due process under the Cook County Code of Ordinances (the Cook County Code). We note that this requires us to first determine whether plaintiffs are governed by the Cook County Code at all. This is not an obvious question, as the County Shelter Care and Detention Home Act (Detention Home Act) (55 ILCS 75/1 *et seq.* (West 2018)) provides for an unusual structure for operation of the JTDC. Section 1 of the Detention Home Act gives the county the authority to establish and maintain a detention home for the care and custody of delinquent minors. 55 ILCS 75/1(a) (West 2018). However, with respect to the JTDC, section 3 of the Detention Home Act provides the chief judge with administrative control over the JTDC's budget, subject to the approval of the county board. 55 ILCS 75/3(c) (West 2018). Section 3 further gives the power of appointing the JTDC superintendent and all other necessary JTDC personnel to the chief judge. 55 ILCS 75/3(b) (West 2018). However, salaries of these officials, as well as bills for supplies and repairs necessary to maintain the JTDC, are paid by the county board. 55 ILCS 75/3(a), (d) (West 2018). In other words, the county has the authority to establish the JTDC and financially supports it, but the chief judge has the power to control the budget and appoint its personnel. The question, then, is whether employees of the JTDC, such as plaintiffs in the case at bar, are governed by the county's personnel rules or by rules dictated by the chief judge's office. We cannot definitively answer this question at this early stage in the proceedings, as it involves numerous factual issues that cannot be decided on the basis of the pleadings. However, we note that, in his complaint, Mullins alleges that Cook County continues to pay the salaries and

benefits for JTDC employees, identifies JTDC employees as county employees for purposes of its pension plan, and makes contributions on JTDC employees' behalf to the pension fund from their county wages. Accordingly, for the purposes of determining whether plaintiffs have stated a cause of action for due process violations, we find that plaintiffs have adequately alleged that they are subject to the Cook County Code.[7]

¶ 49       We turn, then, to considering whether the Cook County Code provides plaintiffs with a protectable property interest in their continued employment. Plaintiffs rely on two provisions. The first, section 44-50 of chapter 2, article II, provides for appeals for career service employees who are not members of a union and who have been discharged, demoted, or suspended for a period of more than 10 days. Cook County Ordinance No. 00-O-08, art. I(6) (amended Apr. 5, 2000). However, this provision is not applicable to either plaintiff—Doyle is a member of a union, and Mullins was suspended for only one day. Moreover, even if we conclude that Mullins is covered due to the later 15-day suspension that Mullins claims was also in retaliation for his report, the fact that an employee is entitled to an appeal does not suggest that the employee has a property interest in his or her continued employment.

¶ 50       The other section, section 44-51 of chapter 2, article II, provides that "[t]he Chief of Human Resources shall prescribe uniform procedures for pursuing grievances for career service employees where such grievance procedures are not provided in a collective bargaining agreement, including provisional employees." Cook County Ordinance No. 00-O-08, art. I(7) (amended Apr. 5, 2000). However, again, as a union employee, Doyle is not covered by any

---

[7] We note that this conclusion does not impact our analysis as to the Ethics Code or the Whistleblower Act, as discussed later in our analysis. Our conclusion here is simply that plaintiffs have alleged sufficient facts to bring them within the Cook County Code.

grievance procedures set forth by section 44-51, by its express terms. Accordingly, any rights provided by the county ordinance would apply solely to Mullins.

¶ 51      As noted, section 44-51 provides that the Chief of Human Resources shall provide procedures for pursuing grievances, and these rules appear on the Cook County Bureau of Human Resources' website.[8] See Cook County Gov't, Personnel Rules & Policies, https://www.cookcountyil.gov/service/county-cook-personnel-rules (last visited Mar. 24, 2021) [https://perma.cc/2ZK8-3LHU]. The disciplinary procedures set forth in the personnel rules do provide that all discipline shall be given only for just cause and, more specifically, that "[d]ischarge is invoked for just cause." This language would support plaintiffs' argument as to a property right in continued employment with the JTDC. However, the personnel rules contain a disclaimer, which expressly provides:

> "Please be advised that these Rules do not constitute a contract, and the language used in these Rules is not intended to be construed as a contract or promise of continued employment." Cook County Personnel Rules, https://www.cookcountyil.gov/file/7792/download?token=x5eYnLYn (last visited Mar. 24, 2021 [https://perma.cc/5H7Q-AVQK].

Accordingly, to the extent that the language in the disciplinary process could be construed to provide a property right in continued employment, the express language of the disclaimer makes clear that no such right is intended. Consequently, we cannot interpret the language in such a way and must conclude that neither plaintiff has a protectable property interest in continued employment with the JTDC. Since neither plaintiff has a protectable property

---

[8] We note that, while plaintiffs raise the Cook County Code as the source of their property interest, none of the parties discuss the actual personnel rules promulgated pursuant to the ordinance.

interest in continued employment with the JTDC, plaintiffs cannot state a cause of action for violations of due process, and we have no need to consider plaintiffs' arguments as to whether the hearings they were provided were constitutionally adequate. Therefore, the trial court properly dismissed count II under section 2-615 of the Code.

¶ 52     As a final matter, plaintiffs claim that they had liberty interests, including their interests in their good names, that necessitated a postdisciplinary hearing. However, to allege a violation of an employee's interest in occupational liberty, a plaintiff must allege that (1) the defendant made stigmatizing comments against him, (2) those comments were publicly disclosed, and (3) he suffered a tangible loss of other employment opportunities as a result of the public disclosure. *Palka*, 623 F.3d at 454. The public-disclosure element requires that the defendant actually disseminate the stigmatizing comments in a way that would reach potential future employers or the community at large. *Palka*, 623 F.3d at 454. Plaintiffs have failed to allege any of these elements, and accordingly, there is no basis for their claim concerning their liberty interests.

¶ 53                                C. Count III—Civil Conspiracy

¶ 54     Count III of the complaints, against the JTDC defendants, alleged that the JTDC defendants engaged in a conspiracy against plaintiffs. "The elements of a civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317 (2004) (citing *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62-63 (1994)). A conspiracy is "almost never susceptible to direct proof." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 134 (1999). Instead, it is usually established " 'from

circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances.' " *McClure*, 188 Ill. 2d at 134 (quoting *Adcock*, 164 Ill. 2d at 66). However, where a conspiracy is established by circumstantial evidence, "that evidence must be clear and convincing." *McClure*, 188 Ill. 2d at 134.

¶ 55    In the case at bar, count III of the complaints is not entirely clear as to what conduct plaintiffs allege to be the purpose of the conspiracy as opposed to the act committed in furtherance of the conspiracy. For instance, Doyle's complaint alleges, in various places, that (1) the JTDC defendants conspired to cover up the unlawful carrying of a firearm into the JTDC; (2) the JTDC defendants conspired to violate Doyle's rights; (3) the JTDC defendants conspired to damage Doyle's "reputation, finances, emotional well-being and standing in the community"; and (4) the JTDC defendants conspired to impose retaliatory discipline and loss of pay and benefits. However, based on their briefs, plaintiffs appear to be alleging that the JTDC defendants conspired to punish plaintiffs for investigating the possible security breach and did so by imposing unlawful discipline.

¶ 56    We cannot find, however, that these allegations are sufficient to state a cause of action for civil conspiracy. Plaintiffs fail to establish any connection between Dixon, Burger, and McGhee to support their theory that they conspired to punish plaintiffs. We recognize, as plaintiffs contend, that at this stage of the proceedings, they have not been entitled to discovery, making it difficult to provide specific details. However, plaintiffs are required to provide more than bald allegations that the three defendants were acting in concert. See *Fritz*, 209 Ill. 2d at 318. Furthermore, as explained above in our analysis concerning plaintiffs' first amendment claims in count I, plaintiffs are not able to establish that their discipline was unlawful, meaning

that they are unable to show that the JTDC defendants committed a tortious or unlawful act in furtherance of any conspiracy. Accordingly, the trial court properly dismissed count III of plaintiffs' complaint under section 2-615 of the Code.

¶ 57                                    II. Section 2-619

¶ 58        As noted, defendants in the case at bar filed motions to dismiss under both section 2-615 and section 2-619 of the Code. We have discussed counts I through III above, and since we have determined that each of those counts was properly dismissed under section 2-615, we have no need to consider whether they were also subject to dismissal under section 2-619. Additionally, the trial court below dismissed counts IV and V against the chief judge alone and denied the motion to dismiss with respect to the JTDC defendants. Consequently, our analysis here concerns only the claims against the chief judge and does not reflect any findings as to the merits of the claims against the JTDC defendants.

¶ 59        A motion to dismiss under section 2-619 admits the legal sufficiency of all well-pleaded facts but allows for the dismissal of claims barred by an affirmative matter defeating those claims or avoiding their legal effect. *Janda v. United States Cellular Corp.*, 2011 IL App (1st) 103552, ¶ 83 (citing *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006)). When reviewing a motion to dismiss under section 2-619, "a court must accept as true all well-pleaded facts in plaintiffs' complaint and all inferences that can reasonably be drawn in plaintiffs' favor." *Morr-Fitz, Inc. v. Blagojevich*, 231 Ill. 2d 474, 488 (2008). Additionally, a cause of action should not be dismissed under section 2-619 unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief. *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 277-78 (2003). As with a section 2-615 motion, for a section 2-619 dismissal, our standard of review is *de novo*. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006);

28

*Morr-Fitz, Inc.*, 231 Ill. 2d at 488. As noted, *de novo* consideration means we perform the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578. Additionally, as with a section 2-615 dismissal, even if the trial court dismissed on an improper ground, a reviewing court may affirm the dismissal if the record supports a proper ground for dismissal. See *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 261 (2004) (when reviewing a section 2-619 dismissal, we can affirm "on any basis present in the record"); *In re Marriage of Gary*, 384 Ill. App. 3d 979, 987 (2008) ("we may affirm on any basis supported by the record, regardless of whether the trial court based its decision on the proper ground").

¶ 60                              A. Count IV—Ethics Act

¶ 61        Count IV of the complaints was for violation of the Ethics Act, and it alleged that the chief judge, through his appointees at the JTDC, engaged in retaliatory action due to plaintiffs' reporting misconduct to law enforcement. Section 10-15 of the Ethics Act provides:

> "An officer, a member, a State employee, or a State agency shall not take any retaliatory action against a State employee because the State employee does any of the following:
>
> (1) Discloses or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of any officer, member, State agency, or other State employee that the State employee reasonably believes is in violation of a law, rule, or regulation.
>
> (2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of a law, rule, or regulation by any officer, member, State agency, or other State employee.
>
> (3) Assists or participates in a proceeding to enforce the provisions of this Act." 5 ILCS 430/15-10 (West 2018).

¶ 62    The chief judge claims that this section does not apply to him because he is not an "officer, a member, a State employee, or a State agency" (5 ILCS 430/15-10 (West 2018)). The definition of "State agency" set forth in section 1-5 of the Ethics Act is expansive, but it expressly provides that " 'State agency' does not include the judicial branch." 5 ILCS 430/1-5 (West 2018). The chief judge claims that, as a part of the judicial branch, he is excluded from section 15-10 by its express terms. We agree.

¶ 63    While plaintiffs contend that the chief judge is acting in a nonjudicial capacity when he administers the JTDC, there can be no dispute that his position as administrator is a direct result of his status as chief judge. See 55 ILCS 75/3(b), (c) (West 2018). While we make no comment on the JTDC defendants' contention that the entire JTDC is part of the judicial branch, it is nevertheless clear that the chief judge himself does not lose his status as an officer of the judicial branch simply because the legislature has chosen to vest in him administrative control of the JTDC. It is well settled that, when the language of a statute is plain and unambiguous, the statute must be applied as written and the court may not depart from the plain language by reading into it exceptions, limitations, or conditions the legislature did not express. *People ex rel. Madigan v. Kinzer*, 232 Ill. 2d 179, 184-85 (2009). Section 15-10 of the Ethics Act, by its express terms, does not apply to members of the judicial branch and, therefore, does not apply to the chief judge.

¶ 64    We do not find persuasive plaintiffs' attempts to circumvent the language of section 15-10 by reading it to apply more broadly to all "public bodies." It is true that section 15-5 of the Ethics Act (the definitions section of the antiretaliation portion of the statute) defines a "public body" to include the judiciary. 5 ILCS 430/15-5 (West 2018). However, as set forth above, section 15-10 does *not* provide that employees of "public bodies" are prohibited from

30

retaliating—it provides that *"State employee[s]"* are prohibited from retaliating. (Emphasis added.) 5 ILCS 430/15-10 (West 2018). "State employee" has a specific meaning defined within the Ethics Act, and the judiciary is not included in that definition.[9] The only reference to "public bodies" in the antiretaliation provision occurs in the context of what disclosure is protected—section 15-10 provides that a State employee is protected from retaliation for, *inter alia*, disclosing *to a public body* any wrongdoing. 5 ILCS 430/15-10(1) (West 2018). If the legislature had intended for all public bodies to be subject to the provisions of section 15-10, it certainly could have said so. Instead, it specifically excluded the judiciary from that provision, and we must apply the statute as written. Consequently, as section 15-10 does not apply to the chief judge, the trial court properly dismissed count IV against him.

¶ 65                              B. Count V—Whistleblower Act

¶ 66            Finally, count V of the complaints was for violation of the Whistleblower Act and, like the Ethics Act count, alleged that plaintiffs were retaliated against for reporting wrongdoing to a law enforcement agency. Section 20 of the Whistleblower Act provides:

> "An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation, including, but not limited to, violations of the Freedom of Information Act." 740 ILCS 174/20 (West 2018).

We note that it does not appear that any state court has considered whether the State itself is subject to the provisions of the Whistleblower Act. See *Harris v. Illinois*, 753 F. Supp. 2d 734, 742 (N.D. Ill. 2010) (noting that, while at least two federal district courts have concluded,

---

[9] Plaintiffs also suggest that the definition of a "State employee" is not limited to employees of a State agency. However, the Ethics Act specifically provides that a " 'State employee' means any employee of a State agency." 5 ILCS 430/1-5 (West 2018).

without discussion, that the State is an employer under the Whistleblower Act, no state court has addressed the issue). However, the chief judge does not claim that he is not considered an "employer" under the Whistleblower Act but instead argues that the claim against him is barred by sovereign immunity. Accordingly, we consider the issue raised by the parties and leave to another day the question of the applicability of the Whistleblower Act to State entities.

¶ 67 The State Lawsuit Immunity Act provides that, "[e]xcept as provided in the Illinois Public Labor Relations Act [(5 ILCS 315/1 *et seq*. (West 2018))], the Court of Claims Act [(705 ILCS 505/1 *et seq*. (West 2018))], the State Officials and Employees Ethics Act, and Section 1.5 of this Act, the State of Illinois shall not be made a defendant or party in any court." 745 ILCS 5/1 (West 2018). "The determination of whether an action is in fact a suit against the State turns upon an analysis of the issues involved and the relief sought, rather than the formal designation of the parties." *Currie v. Lao*, 148 Ill. 2d 151, 158 (1992); *Jinkins v. Lee*, 209 Ill. 2d 320, 330 (2004). An action brought against a State employee in his individual capacity will be found to be a claim against the State "where a judgment for the plaintiff could operate to control the actions of the State or subject it to liability." *Currie*, 148 Ill. 2d at 158.

¶ 68 Our supreme court has cautioned that the determination of whether an action against a State employee is properly characterized as an action against the State itself does not depend simply on whether the employee was acting within the scope of his employment when he committed the act in question. *Fritz*, 209 Ill. 2d at 310. "Rather, the applicability of sovereign immunity turns on the *source of the duty* with the breach of which the employee is charged." (Emphasis in original.) *Fritz*, 209 Ill. 2d at 310 (citing *Currie*, 148 Ill. 2d at 159). If the duty is imposed simply by virtue of the individual's employment with the State, sovereign immunity attaches, and the Court of Claims has exclusive jurisdiction over the claim. *Fritz*, 209 Ill. 2d at 310-11.

By contrast, where the duty exists independently of State employment, the individual is subject to suit in circuit court. *Fritz*, 209 Ill. 2d at 311.

In the case at bar, we agree with the chief judge that sovereign immunity bars plaintiffs' claims against him under the Whistleblower Act. We note that plaintiffs' complaints do not allege that the chief judge himself participated in any aspect of their discipline. Instead, his involvement in the lawsuit is vicarious, resulting from his appointment of Dixon, a power he has only by virtue of his position as chief judge. In other words, any duties he has arise from his State employment, not from any independent source. Therefore, we agree with the trial court that sovereign immunity bars plaintiffs' claims against the chief judge and that count V was properly dismissed under section 2-619 of the Code.

¶ 69                                    CONCLUSION

¶ 70        For the reasons set forth above, the trial court's judgment is affirmed. The trial court properly dismissed counts I, II, and III pursuant to section 2-615 of the Code, and it properly dismissed counts IV and V against the chief judge pursuant to section 2-619 of the Code.

¶ 71        Affirmed.

---

**No. 1-19-1962**

---

| | |
|---|---|
| **Cite as:** | *Mullins v. Evans*, 2021 IL App (1st) 191962 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 2017-L-012175, 2018-L-004059; the Hon. Moira S. Johnson, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | John T. Moran Jr., of Moran Law Group, and Ivan M. Rittenberg, of Saks, Robinson, & Rittenberg, Ltd., both of Chicago, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Christina T. Hansen and Frank H. Bieszczat, Assistant Attorneys General, of counsel), for appellee Timothy C. Evans. |
| | Kimberly M. Foxx, State's Attorney, of Chicago (Lyle K. Henretty and Patrick D. Morris, Assistant State's Attorneys, of counsel), for other appellees. |

---