2022 IL App (1st) 201368

FIRST DISTRICT
SIXTH DIVISION
April 15, 2022

No. 1-20-1368

| | | |
|---|---|---|
| ALEX DVORKIN, Individually and as a Member of Aldi Development, LLC, and ALDI DEVELOPMENT, LLC, | ) ) ) | Appeal from the Circuit Court of Cook County |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 18 CH 3566 |
| COREY SODERQUIST, SANDRA RIVERA, and XSERVE SOLUTIONS, LLC, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| (Corey Soderquist and Sandra Rivera, Defendants-Appellees.) | ) ) ) | Honorable Pamela McLean Meyerson, Judge presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiffs Alex Dvorkin, individually and as a member of Aldi Development, LLC, and

Aldi Development, LLC (Aldi), brought suit against defendants Corey Soderquist, Sandra Rivera,

and XServe Solutions, LLC (XServe), alleging in relevant part fraud, conspiracy to commit fraud,

and violation of the Illinois Securities Law of 1953 (Securities Law). 815 ILCS 5/1 *et seq.* (West

2018). The trial court granted with prejudice a motion to dismiss by Soderquist and Rivera as to

those three claims while allowing plaintiffs' claims for breach of contract against XServe to

proceed. On appeal, plaintiffs contend that the court erred in dismissing the three claims with

prejudice. For the reasons stated below, we affirm the judgment for defendants Soderquist and Rivera.

¶ 2                                    I. JURISDICTION

¶ 3    The trial court dismissed three counts of plaintiffs' second amended complaint with prejudice on November 19, 2020, finding that two claims remained pending, no claims remained against Soderquist and Rivera, and there was no just reason to delay appeal or enforcement of its order. See Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). Plaintiffs filed their notice of appeal on December 18, 2020. Thus, this court has jurisdiction in this matter pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) governing appeals in civil cases from judgments that are final as to one or more, but not all, claims and parties.

¶ 4                                    II. BACKGROUND

¶ 5    Aldi and XServe entered into a written loan agreement on January 23, 2017, signed by Candice Starkey for XServe and Dvorkin for Aldi. The initial paragraph of the agreement did not name the "Lender" but recited that the lender is "an individual residing in the state of Illinois" and included a phrase as a placeholder for the lender's name—"[lenderFull Name]"—that was not filled in. The following paragraph, titled "Recitals," stated that the "Lender is a member of" XServe and that it and "two other members" agreed to loan money to XServe "to fund its ramp up and operations, subject to the terms of this Agreement." That said, Aldi was clearly identified as the lender in both the notice section and signature section of the loan agreement.

¶ 6    As evidenced in an attached $250,000 promissory note, Aldi loaned XServe up to $250,000 at 6% annually, with the principal to be repaid within five years and interest to be paid quarterly from July 1, 2017, onward. The agreement granted Aldi a security interest in all accounts "now owned or hereafter acquired by" XServe including "accounts receivable, notes, notes receivable,

instruments, drafts, acceptances, book debts, chattel paper, letter of credit rights, and similar documents and other monies, obligations or indebtedness owing or to become owing to" XServe.

¶ 7    The first paragraph of the promissory note included similar incomplete placeholders as the first paragraph of the loan agreement—"[LenderFullName]" and "[LoanAmountWritten]"—and similarly recited that "Lender" is "an individual residing in the state of Illinois." The note recited that it was "being issued in connection with the consummation of the transactions contemplated by that certain Loan Agreement between Lender and [XServe]**,** which is specifically incorporated herein by reference," with no reference to any other agreement between the parties.

¶ 8    XServe warranted in the agreement that it was a limited liability company in good standing, that it duly executed the agreement, that no judgments or suits were pending against it, that the agreement would not violate any law, regulation, court order, XServe's charter or bylaws, or any contract to which XServe was a party, and that any financial statements XServe provided to Aldi were correct in all material respects. XServe agreed to use the borrowed funds solely for its operating expenses, to promptly make all payments, to notify Aldi of any "threatened or actual" criminal or civil proceedings that could materially affect XServe, to notify Aldi of any potential default, and to not spend more than $375,000 per year on distributions or bonuses for members or equity owners. If XServe violated the loan agreement, Aldi could declare all obligations thereunder immediately due and exercise its security interests, with XServe liable for any deficiency from enforcing the security interests. The agreement expressly provided for Aldi to receive interest, attorney fees, and court costs for successfully enforcing its rights under the agreement.

¶ 9    The agreement included a clause titled "Entire Agreement" and providing that the agreement itself, the promissory note,

"and any attached schedules and exhibits contain the entire agreement of the Parties hereto with respect to the matters covered and the transactions contemplated hereby, and no other

agreement, statement or promise made by any Party hereto, or by any employee, officer, agent or attorney of any Party hereto, which is not contained herein will be valid or binding."

Neither the loan agreement nor the promissory note provided for Aldi or Dvorkin to receive a share in the profits—net, gross, or otherwise—of XServe.

¶ 10                                         A. Initial Complaint

¶ 11    Plaintiffs filed their initial complaint in March 2018, alleging that defendant XServe was a collection agency focusing on student loan debt and run by defendants Soderquist, Rivera, and Starkey and by Nicholas Abernethy. Defendants had represented that they had over 75 years of combined experience in debt collection and that Soderquist had 16 years in information technology management. XServe had a website and other materials to seek out investors to finance its purchase of student loan debt. In October 2016, Starkey submitted to plaintiff Dvorkin a business plan and two-year projection for XServe. Starkey also told Dvorkin that because Abernethy was a disabled veteran, XServe could buy student loan debt at a deep discount and would receive benefits reserved for veteran-run businesses. On or about October 30, 2016, XServe "through Rivera, Soderquist, [and] Starkey solicited" Dvorkin to loan $250,000 to XServe for operating funding.

¶ 12    In December 2016, Rivera and Starkey told Dvorkin that XServe would be able to repay the loan "due to the large anticipated profit margin," that the student loans were secure because they could not be discharged in bankruptcy, and that Soderquist, Rivera, Starkey, and Abernethy would each invest $250,000 in XServe. XServe prepared a loan agreement and promissory note undertaking to repay the $250,000 loan over five years "with quarterly payments at 6% and 5% of the net profits." However, in January 2017, "Abernethy had left Xserve," and Soderquist, Rivera, Starkey, and Abernethy "failed to invest the $250,000 each they promised to invest for capital."

¶ 13    Rivera requested that Dvorkin wire "the money" on or about February 28, 2017. In March 2017, Rivera "left" XServe, which "lost its debt collection license," and Soderquist and Starkey took control of XServe. XServe "did not purchase any debt with the money and instead used the funds to pay their salaries and expenses." XServe also did not register the business plan or promissory note with the "Illinois Secretary of State as [r]equired under the Illinois Securities" Law. XServe "as national debt collector was required to register [as] a debt collector in each state that it seeks to collect," but "Soderquist explained that because of the debt that XServe incurred from Plaintiffs it was unable to register in each state to operate" and asked Dvorkin to cancel the debt and convert it into equity.

¶ 14    In November 1997, Soderquist was sentenced to 87 months in prison on unrelated criminal charges that barred him from using the Internet while on probation until 2004. "Soderquist, Starkey, and Rivera failed to disclose Soderquist's previous federal criminal record prevented him from registering" as a debt collector in many states despite having knowledge of that record. Plaintiffs also alleged that defendants "did not register the promissory note under the Illinois Securities [Law] or under the Securities Exchange Act."

¶ 15    Plaintiffs alleged that, on "October 1, 2017, Xserve failed to pay the required interest only payment to Plaintiffs" and on "December 14, 2017, Plaintiffs served Notice to the Defendants that they were in default and accelerated the balance of the loan." While XServe made a partial payment of $1250 on or about December 26, 2017, it made no subsequent payments.

¶ 16                            1. Counts of the Complaint

¶ 17    On these allegations, plaintiffs alleged six counts. The first alleged that defendants violated the Securities Law in that the promissory note was a security thereunder that defendants failed to register thereunder and sold in violation thereof. It also alleged that defendants circulated a business plan that made material representations as to the profitability of XServe and that they

obtained the loan from plaintiffs "by means of an untrue statement of material fact or omission," including:

"a) That the loan funds would be used to acquire student loans[,]

b) That the Defendant had experience in collecting Student Loans[,]

c) That the Defendants would each invest $250,000 as startup capital to Fund Xserve[,]

d) That Nicholas Abernathy['s] status as a[n] injured veteran would entitle Xserve to benefits in obtaining the student loan debt[,]

e) Omission of the Fact That Nicholas Abernathy had left the company at the time the Loan[,]

f) That Xserve would be able to generate sales in excess of $2,842,847 in the first year[,] ***

g) That the Defendants omitted to disclose Soderquist['s] serious felony criminal conviction[, and]

h) Mispresented Soderquist['s] experience as he was prohibited from using an internet connected computer after his release for prison in 2001 for a period of 3 years."

These alleged statements and omissions "worked a fraud or deceit upon Plaintiffs," for which defendants Soderquist, Rivera, and Starkey were jointly and severally liable. They rendered the promissory note voidable, plaintiffs claimed, and plaintiffs sought a "recission in the amount in excess of $250,000" plus accrued interest, attorney fees, and costs.

¶ 18    Counts II and III alleged breach of written contract by XServe insofar as plaintiffs—Dvorkin in count II and Aldi in count III—and XServe formed a valid contract on or about January 23, 2017, by XServe making an offer, Dvorkin accepting it, and Dvorkin tendering $250,000 consideration. Plaintiffs performed their obligations with that tender while XServe materially

breached the contract by not making the October 2017 payment, these counts alleged. These counts also sought damages in excess of $250,000 with interest, attorney fees, and costs.

¶ 19    Count IV alleged fraud in that, on or about January 23, 2017, Rivera and Starkey made alleged misrepresentations, knowing them to be false or with culpable ignorance of their falsity and intending plaintiffs to rely upon them to make the $250,000 loan:

> "a) That the loan funds would be used to acquire student loans[,]
>
> b) That the Defendant had experience in collecting Student Loans[,]
>
> c) That the Defendants would each invest $250,000 as startup capital to Fund Xserve[,]
>
> d) That Nicholas Abernathy['s] status as an injured veteran would entitle Xserve to benefits in obtaining the student loan debt[,]
>
> e) Omission of the Fact That Nicholas Abernathy had left the company at the time the Loan[,]
>
> f) That Xserve would be able to generate sales in excess of $2,842,847 in the first year [,] *** [and]
>
> g) Mispresented Soderquist['s] experience as he was prohibited from using an internet connected computer after his release for prison in 2001 for a period of 3 years."

They also omitted material facts, which had plaintiffs known they would not have made the loan:

> "a) That Nicholas Abernathy had left the company at the time the Loan [and]
>
> b) That the Defendants omitted to disclose Soderquist['s] felony criminal conviction."

Plaintiffs alleged that they reasonably relied upon the statements of Rivera and Starkey and were injured thereby, to the sum of at least $250,000 plus interest, attorney fees, and costs.

¶ 20    Count V alleged conspiracy to commit fraud, in that Soderquist, Rivera, and Starkey willfully "engaged in a general scheme to defraud Plaintiffs." Soderquist aided Rivera and Starkey by "attempting to cover up the violations of securities exchange act by attempting to converting the debt into stock in this scheme." Soderquist was allegedly bound by the words and acts of Rivera and Starkey in furtherance of the conspiracy. Plaintiffs alleged being damaged as a direct result of the conspiracy for at least $250,000 plus interest, attorney fees, and costs.

¶ 21    Count VI alleged violation of the Racketeering Influenced and Corrupt Organizations Act (RICO). 18 U.S.C. § 1962(c) (2018). Defendants were an enterprise as defined in RICO and conducted the enterprise's affairs "through a pattern of racketeering" "by engaging in at least two counts of mail and wire fraud" and by Soderquist, Rivera, and Starkey publishing fraudulent material on the XServe website. Plaintiffs alleged a nexus between defendants' acts and the enterprise "in that the mail fraud enabled Defendants to unlawfully receive from Plaintiffs money for the fraudulent investment." Plaintiffs sought treble damages plus attorney fees and costs.

¶ 22                                    2. Complaint Exhibits

¶ 23    Attached to the complaint, and to all subsequent iterations of the complaint, was a printout of XServe's website including brief biographies of Abernethy, Rivera, and Soderquist. Also attached were copies of the aforesaid loan agreement and promissory note and XServe's business and marketing plan.

¶ 24    The plan recited that it was confidential and to be read by only authorized parties and that it was not an offering for securities. XServe "will arrange for the collection of debts and additional, associated-account services on behalf of clients within the target market," which was "US Department [of] Education debt collection contract servicing, non-federal debt collections and Federal and State contract work." XServe would be

"in the business of providing collection, administrative support, and consulting services to collection agencies specializing in federal and state debt collection contracts, although Xserve will support other lines of business as well (private entity debt collections). XServe's intent is to offer high-quality efficient services which will allow our clients to reduce operational cost and take advantage of operational efficiencies."

XServe sought to raise $1 million from its "management, outside investment, and a bank loan," which would be used for "Development of the Company's office location and furnishings," "Financing for the first eighteen months of operation, including employment costs," and "Capital to obtain the Company's licensure."

¶ 25     The plan acknowledged that there would be "minimal" revenue from Department of Education contracts in the first year of operation, as "[u]nlike administrative and consulting services which will earn sales revenue in the same month or next month, it takes between three and nine months to earn the full revenue on a collection contract." The plan projected sales of about $2.8 million in 2017, $8 million in 2018, $10.2 million in 2019, $12.3 million in 2020, and $14.9 million in 2021, but with estimated expenses it projected a loss in 2017 and profits of about $1.1 million in 2018, $2.1 million in 2019, $2 million in 2020, and $3.2 million in 2021.

¶ 26     XServe was seeking $1 million to cover startup costs. One projection of those startup costs included $534,000 for "Non-Management Salaries" and $300,000 for "Management Salaries" along with $60,000 for "Professional Fees and Licensure," with other expenses being leasing and improving XServe's offices, buying information technology and insurance, marketing, and $5000 for miscellaneous and unforeseen expenses. Another projection on the same page of the plan included $753,000 for nonmanagement salaries, no money for management salaries, and the same categories of other expenses as the first projection including $14,012 for miscellaneous and

unforeseen expenses. None of the listed expenses upon which the $1 million was to be spent in either projection consisted of buying student loans.

¶ 27　The plan stated that "Xserve's service disabled veteran owned certification significantly increases sub-contracting opportunities." The plan disclosed that Abernethy owned 51% of XServe with the remainder "distributed among the existing management team" and an unspecified percentage "available to a third-party investor" and that Abernethy "may seek to sell the business to a third party." The plan disclosed that the student loan business could be affected by federal political or policy changes and that the collection agency market is competitive but asserted that XServe would have a "competitive advantage" from over 30 years of experience and from being "Service-Disabled Veteran Owned."

¶ 28　　　　　　　　　B. Proceedings on the Initial Complaint

¶ 29　Rivera appeared and filed a motion to dismiss, arguing that the complaint made conclusory and false allegations, that plaintiffs were not entitled to a judgment against Rivera or the other personal defendants even if the allegations were considered true, and that the loan agreement was with Aldi so that Dvorkin's claims should be dismissed.

¶ 30　Rivera first argued that defendants did not offer any securities for sale so that Aldi had no claim under the Securities Law. Aldi's claim under count I was based on a conclusory allegation that promissory notes are securities. However, the Securities Law exempts private sales, with commissions not exceeding 20% and without public advertisement or solicitation, of securities not exceeding $1 million to no more than 35 investors. 815 ILCS 5/4(G) (West 2018). Similarly, isolated transactions are not subject to registration under the Securities Law. *Id.* § 4(Q). The $250,000 promissory note here was not a security and did not need to be registered, Rivera argued.

¶ 31　Rivera also sought dismissal of counts IV and V against her on the grounds that she was a member of XServe and all her communications with plaintiffs were on XServe's behalf. Citing the

Limited Liability Company Act (LLC Act) (805 ILCS 180/1-1 *et seq.* (West 2018)), she argued that she could not be held individually liable for XServe's debts, obligations, or liabilities.

¶ 32    Lastly, Rivera argued that the single solicitation for a loan from plaintiffs could not constitute a violation of RICO as alleged in count VI. RICO penalizes a pattern of racketeering activity (see 18 U.S.C. § 1962(c) (2018)) alleged with specificity, but the complaint alleged in a conclusory manner that there were at least two instances of mail or wire fraud without specifying what was said or when. Even if there were two qualifying acts, Rivera argued, the RICO claim would fail for lack of continuity: that is, related acts over a substantial period of time or a threat of ongoing criminal activity. The four months between defendants contacting plaintiffs and the execution of the loan agreement was not a substantial period of time, and there was no allegation of future misconduct. In sum, Rivera argued, a single alleged victim in a single scheme is not racketeering under RICO.

¶ 33    Soderquist appeared and filed motions to dismiss raising similar arguments: that he was not a party to the loan agreement, that Dvorkin was also not a party to the loan agreement, that the promissory note did not fall under the Securities Law, and that the alleged misconduct was not extensive enough to constitute racketeering under RICO. Soderquist also argued that count IV, alleging fraud, raised unrecognized claims of promissory fraud and alleged misrepresentations that were not material and that count V alleged conspiracy but "agents of the same company cannot conspire with themselves." Soderquist also sought to strike as immaterial and prejudicial the allegations that he was convicted of unrelated offenses and barred from the Internet until 2004 when the acts at issue herein occurred years later.

¶ 34    Soderquist interposed the LLC Act, limiting the personal or individual liability of members and managers of such companies, as a defense. Soderquist also interposed a defense that Aldi is also a limited liability company and it, not Dvorkin, was a party to the loan agreement so that

Dvorkin did not have the capacity to bring this action. Attached to the motion raising these defenses were copies of the computerized records of the Illinois Secretary of State reflecting that XServe and Aldi were registered and active limited liability companies. Also attached was Soderquist's affidavit to the effect that the $250,000 loaned funds were wired to XServe by Aldi, not Dvorkin, which in turn was supported by copies of a February 2017 bank statement and a December 2017 letter from Aldi's attorney alleging XServe's default, describing the attorney's client and XServe's creditor as Aldi, not Dvorkin.

¶ 35    Starkey filed a "suggestion of bankruptcy" or notice that she filed for bankruptcy in July 2018 and that a stay of all proceedings against her or her property was therefore in effect.

¶ 36    In February 2019, the court granted plaintiffs leave to file an amended complaint.

¶ 37                    C. First Amended Complaint and Proceedings Thereon

¶ 38    Plaintiffs filed their first amended complaint in March 2019, no longer including a sixth count or raising a RICO claim. It also no longer named Starkey as a defendant and no longer sought relief from her, acknowledging that she received a discharge in bankruptcy in January 2019. The amended complaint added an allegation that, when Soderquist sought in November 2017 to convert the loan into equity, "Soderquist knew that Xserve could not pay on the Promissory note and attempted to delay Plaintiffs from collecting on the Promissory Note." The amended complaint was otherwise substantially unchanged, including still alleging in a conclusory manner that the promissory note was a security under the Securities Law and still alleging Soderquist's criminal conviction and prohibition from the Internet until 2004.

¶ 39    Rivera filed a motion to dismiss the first amended complaint, reiterating her arguments that the promissory note and loan agreement fell under an exception to the Securities Law so that count I should be dismissed, the agreement was with Aldi and not Dvorkin so that count II should be dismissed, and she is not personally liable for XServe's obligations so that counts IV and V should

be dismissed. Rivera also argued that plaintiffs' allegation that they were due 5% of the net profits as well as 6% interest under the promissory note and loan agreement was utterly unsupported by those documents. Plaintiffs' allegation that the loan was to fund only the purchase of student loans was refuted by the loan agreement provisions that the funds would be used for XServe's operating expenses and that XServe would not pay more than $375,000 annually in distributions or bonuses. She also argued that the agreement's "Entire Agreement" clause precludes plaintiffs from claiming reliance on promises or representations other than those in the agreement and promissory note.

¶ 40     Plaintiffs responded to Rivera's motion to dismiss, maintaining that the promissory note was a security subject to the Securities Law so that failing to register the note as a security was a violation. In particular, they argued, promissory notes with a maturity longer than nine months are securities unless they bear a disclaimer pursuant to section 3 of the Securities Law. 815 ILCS 5/3(L) (West 2018). They also argued that the promissory note and loan agreement were not a simple loan because of the provision for Aldi to receive 5% of XServe's net profits, citing that allegation in the amended complaint. As to counts IV and V of the amended complaint, plaintiffs argued that Rivera was not shielded from liability for fraud by being a member of XServe because the caselaw supporting that proposition was ill-decided and was going to be affected by pending legislation. They also argued that they properly pled various fraudulent statements and their reliance thereon so that dismissal would be inappropriate. Lastly, they argued that they adequately pled an independent cause of action upon which conspiracy could be alleged.

¶ 41     Rivera replied in support of her motion, arguing generally that plaintiffs' claims and the documents filed in support of those claims were contradictory. She responded to plaintiffs' claim that they had a right to 5% of XServe's net profits by noting that neither the loan agreement nor the promissory note so provided so that the allegation in the amended complaint to the contrary was contradicted by the complaint's attached documentation. The claim that the promissory note

was subject to the Securities Law did not acknowledge that the Securities Law provides various independent exemptions so that failing to qualify for one does not preclude eligibility for another. Rivera argued that there were no material misrepresentations to support claims of fraud and that projections of the future cannot be the basis for a fraud claim. In particular, Soderquist not being able to use the Internet to 2004 does not necessarily imply that he could not use or program computers in that time, and plaintiffs themselves alleged that XServe lost its debt collection license so that Soderquist's conviction did not bar receiving such a license as claimed. Rivera noted that the loan agreement provided that promises outside the agreement and promissory note would not be binding. Lastly, Rivera argued that the law providing that members of limited liability companies are not liable for its obligations is sound and stood unaffected by proposed legislation.

¶ 42    Soderquist filed motions to dismiss the first amended complaint, reiterating his earlier arguments that, because the loan agreement was between limited liability companies XServe and Aldi, all claims against the individual defendants and all claims by Dvorkin should be dismissed. He reiterated his argument that the loan agreement and promissory note were not subject to the Securities Law and noted that the acts and omissions alleged in the first and fourth counts were not his. He argued that the allegations of fraud in count IV were contradicted by the loan agreement or immaterial and that a corporation and its agents cannot conspire with each other for purposes of count V, alleging conspiracy to commit fraud. He again sought to strike as immaterial and prejudicial the allegations regarding his criminal conviction.

¶ 43    Plaintiffs responded to Soderquist's motions to dismiss similarly to their response to Rivera's motion, including arguing that the promissory note was a security under the Securities Law and that the LLC Act does not—or, after amendment, would not—shield members from liability as claimed. Plaintiffs also argued that Dvorkin's claims were not merely derivative of Aldi's claims because the loan agreement referred to the lender as an individual and because there

are circumstances under which a member of a limited liability company can advance the company's claims. Lastly, plaintiffs argued that Soderquist's criminal conviction was material to misrepresentation of his years of experience and his ability to receive a debt collection license.

¶ 44    Soderquist replied in support of his motions to dismiss. He argued that claims that he tried to get plaintiffs to accept equity in lieu of loan repayment because he knew XServe could not pay did not allege that he made misrepresentations of fact. He argued that, under the LLC Act, Dvorkin could not bring XServe's claims, and the offhand reference in the loan agreement to the lender as an individual did not render it ambiguous or make Dvorkin the lender rather than Aldi as named in the loan agreement and promissory note. Dvorkin did not lend money to XServe, Aldi did, and only Aldi could assert its rights. Lastly, Soderquist reiterated his argument that reference to his conviction was immaterial and prejudicial. He noted that being barred from the Internet for some time does not by itself mean that he was unable to work with computers and maintain his experience and that a few years' difference from 16 years of experience would be immaterial. He also noted that plaintiffs alleged that XServe lost its debt collection license so that Soderquist's conviction had not barred XServe from having a license in the first place.

¶ 45    In May 2019, the court declined to stay proceedings on the motions to dismiss to await the effectiveness of the proposed legislation, expressly stating that it would apply existing law.

¶ 46    In September 2019, the court ruled upon the motions to dismiss. It found that plaintiffs had not pled sufficient facts to support a conclusion that the loan agreement and promissory note were a security under the Securities Law. It expressed doubt that plaintiffs would be able to plead such facts in light of the agreement's recitation that "plaintiff" was a member of XServe, but they should have the opportunity. The court noted that counts II and III were aimed at XServe, which had not filed a motion to dismiss. As to counts IV and V, the alleged misrepresentations were not made by Soderquist and concerned mostly future projections. After ascertaining from the parties that there

was no jury demand, so that any trial would be a bench trial, the court declined to strike the allegations regarding Soderquist's conviction because they were at least arguably relevant and not unduly prejudicial. As to whether Dvorkin was a proper plaintiff, the court noted that the loan agreement and promissory note were not clear as to whether Aldi or Dvorkin was the lender.

¶ 47    The court therefore issued an order in September 2019 dismissing counts I, IV, and V without prejudice, expressly denying the motions to dismiss as to counts II and III, and granting plaintiffs leave to file an amended complaint.

¶ 48                          D. Second Amended Complaint

¶ 49    Plaintiffs filed their second amended complaint in November 2019. Plaintiffs added allegations that Dvorkin "is an individual who operates a plumbing contractor and is not in the business of lending money" but "nearing retirement age was seeking an investment to provide a stream of income to replace his plumbing income when he retires," that XServe "sought out investors" in mid-2016, and that a relative who was an employee of XServe told him of the investment opportunity. The relative introduced Dvorkin to Starkey, who "sought a $250,000 investment in the company in exchange for 5% of the company" and provided Dvorkin the XServe business plan in October 2016. After Dvorkin sought a higher equity percentage, Starkey "finally agreed [to] sell a 5% membership interest along with an interest only loan of $250,000 as other members of the Xserve had loaned money to Xserve." Plaintiffs also added that Rivera and Starkey told Dvorkin in December 2016 that XServe "has already been funded by a loan from" its members (in contrast to the allegation in the first amended complaint that XServe "would be funded" by its members) and that only Dvorkin's $250,000 was needed "to complete the funding."

¶ 50    As in the two prior complaints, the second amended complaint alleged that the loan agreement and promissory note included a promise to pay 6% interest and 5% of XServe's profits, citing to the attached agreement as exhibit D and promissory note as exhibit E. The second

amended complaint also alleged that "Xserve was to also provide documents evidencing the 5% ownership interest but did not provide the documents," that, "[t]o further entice [Dvorkin] to give the Defendant $250,000 Starkey and Rivera sold Plaintiffs a 5% membership interest in the company in addition to the interest paid on the loan funds," referring to "Exhibit D," and that "Plaintiffs were to receive 5% of the net profits of Xserve which was reflected in the Loan agreement stating that Lender was a member [of] the borrower Xserve" referring to "Exhibit D." As noted above, neither the agreement nor the note mentions either Aldi or Dvorkin receiving a 5% share of XServe's profits, though the agreement includes recitations that "Lender is an individual residing in the state of Illinois" and "Lender is a member of" XServe. Plaintiffs alleged that they sought with the $250,000 investment to receive a "5% membership interest" in XServe and "with the expectation that Plaintiffs will receive a stream of income from the profits from Xserve's net income in addition to interest payment on [the] Promissory Note."

¶ 51    Count I added allegations that (1) the sale of a note, and the sale of any participation in a profit-sharing agreement, is a security under the Securities Law, (2) defendants sold plaintiffs a 5% membership interest in XServe to share in its profits and sold them a promissory note, and (3) plaintiffs were not employees of XServe or involved in its day-to-day operations. Count I also added to the alleged misstatements of fact or omissions by defendants that they omitted how Soderquist's conviction "may affect registration for a debt collection license."

¶ 52    Count IV amended the alleged misrepresentations or omissions by defendants to include that they had made their $1 million in loans or investments (rather than the earlier allegation that they *would* make the loans) and to add that they represented XServe's financial statements to be true.

¶ 53    Count V of the second amended complaint alleged that Soderquist and Rivera, from about October 30, 2016, to December 2017,

"did willfully, knowingly, and unlawfully combine, conspire, confederate, agree and have a tacit understanding with each other and others known and unknown to commit Fraud and violate the of Illinois Securities Act [*sic*] of 1953 and to devise a scheme to defraud Alex Dvorkin and to obtain $250,000 loan and investment in Xserve by means of materially false and fraudulent pretenses, representations and promises."

Count V alleged that they did so by arranging the purchase of the 5% membership interest and the $250,000 loan, by making "several misrepresentations and provid[ing] fraudulent projection and documents, showing that they had already borrowed $1,000,000 and that the other Members had already loaned Xserve Money," and by issuing a business plan, loan agreement, and website with "the following misrepresentations and material omissions[:]

1. That the $250,000 would be used to acquire student loans[,]

2. That the Defendants had already invested $1,000,000 as startup capital to Fund Xserve[,] ***

3. That Nicholas Abernathy['s] status as an injured veteran would entitle Xserve to benefits in obtaining the student loan debt[,]

4. Omission of the Fact That Nicholas Abernathy had left the company at the time [of] the Loan[,]

5. That Xserve would be able to generate sales in excess of $2,842,847 in the first year[,] ***

6. That the Defendants omitted to disclose Soderquist['s] serious felony criminal conviction[, and]

7. Mispresented Soderquist['s] experience as he was prohibited from using an internet connected computer after his release for prison in 2001 for a period of 3 years, until 2004."

¶ 54    Count V alleged that defendants "used unlawful means of misrepresenting the material facts [as aforesaid] to obtain an otherwise lawful act of seeking investment." They issued the biographies of themselves, the XServe business plan, and the loan agreement and promissory note with false statements and misrepresentations "peculiarly within the knowledge of the party making the statement, which materially affect the value, and were not ascertainable by" plaintiffs, and upon which they detrimentally relied. In part, the plan "inflated the income receipt figures based on the $1,000,000 in borrowed funds to use as capital to purchase debt and inflated income figures." Rivera and Starkey met with Dvorkin "from time to time" and misrepresented that XServe had "already secured" $1 million from its other members. As members of the conspiracy. Rivera, Starkey, and Soderquist were responsible for the misstatements of the other members in furtherance of the conspiracy.

¶ 55                    E. Proceedings on the Second Amended Complaint

¶ 56    Rivera filed a motion to dismiss the second amended complaint, arguing that it was fundamentally unchanged from the earlier iterations despite the new allegations and thus had the same flaws so that it should be dismissed with prejudice. No security under the Securities Law was sold for purposes of count I, which did not allege actionable misrepresentations, and plaintiffs did not timely seek rescission under the Securities Law. 815 ILCS 5/13(B) (West 2018). In particular, while plaintiffs alleged that the loan agreement and promissory note gave them a 5% share in XServe's profits, those documents do not so provide or state.

¶ 57    Rivera argued that counts IV and V did not allege fraud with particularity, the alleged misrepresentations were either contradicted by the complaint's attachments or concerned future projections, and the "non-reliance clause in the loan agreement" barred the claims. No count of the second amended complaint stated a valid claim against Rivera, she argued, because the allegedly

wrongful acts were not committed by her. Also, XServe and its members could not conspire with each other because XServe as a limited liability company can do nothing except through its agents.

¶ 58    Plaintiffs responded to Rivera's motion. They argued that she was liable under the Securities Law for how Xserve spent the funds after she left because she made misrepresentations earlier and was involved in the issuance of a security in the form of the loan agreement and promissory note. Plaintiffs also argued that Soderquist's undisclosed conviction meant that XServe "would not be able to register as a Debt collector" or "to be licensed in its home state." Plaintiffs maintained that the loan agreement and promissory note included 5% of XServe's net profits, citing the second amended complaint for the proposition, so that the agreement and note were not a simple loan but a security. Plaintiffs argued that whether they gave proper notice for recission was an issue of law and fact inappropriate for a motion to dismiss and claimed that they sent such notice in December 2017 so that it was not "stale" and there was no prejudice from any delay. Plaintiffs reiterated their argument on the motion to dismiss the first amended complaint that the security did not fall under an exemption in the Securities Law.

¶ 59    Regarding counts IV and V, plaintiffs argued that they alleged fraud with sufficient specificity in light of the fact that there were multiple meetings and documents in which misrepresentations were made. As to XServe's business plan making projections, plaintiffs argued that they should be able to rely on projections in light of defendants' long business experience. As to the "entire agreement" or "non-reliance" clause, plaintiffs argued that those are two different things and the clause in the loan agreement was not the latter, including because it merely states that the parties cannot rely on promises outside the agreement while in a nonreliance clause a party expressly declaims that he or she is relying on promises outside the agreement. Stated another way, an integration clause that the entirety of the agreement is in the written contract does not bar an independent action for fraud. As to conspiracy, plaintiffs argued that the second amended

"complaint states a cause of action based on the fraud and the violation of the Illinois securities Act [*sic*]. The complaint contains all the elements and facts need[ed] for the conspiracy."

¶ 60    Rivera replied in support of her motion to dismiss, reiterating her argument that the allegations in the second amended complaint were contradicted by other allegations, earlier iterations of the complaint, or attachments to the complaint. In particular, plaintiffs' arguments under the Securities Law rested on them having a 5% share in XServe's net profits but the loan agreement and promissory note had no such provision. Noting that said documents were based on a template and that no other provision therein referred to either plaintiff having an ownership stake in XServe, Rivera argued that it was "dubious" that the recitation therein that "Lender is a member of Borrower" is correct. As to the Securities Law provision for rescission, Rivera argued that the December 2017 letter from plaintiffs' counsel to XServe was not attached to the complaint and did not effect a proper rescission under the Securities Law, including that it was not sent to Rivera, who by plaintiffs' own allegation had already left XServe.

¶ 61    As to counts IV and V, Rivera argued that merely asserting that there were multiple misrepresentations made on multiple occasions was insufficient to plead fraud with sufficient particularity. Also, she argued, the misrepresentations were either contradicted by exhibits to the complaint, merely prospective, or not made by Rivera. She also argued that the "Entire Agreement" clause in the loan agreement (1) was both an integration and nonreliance clause because it included nonreliance language and (2) as an integration clause barred plaintiffs from arguing that there were agreements with XServe or other defendants not reflected in the loan agreement and promissory note. Lastly, the conspiracy count could not stand because there was no independent tort or cause of action for fraud or under the Securities Law.

¶ 62    Soderquist filed a motion to dismiss the second amended complaint, arguing that except for count III, where Aldi alleged breach of contract by XServe, all counts should be dismissed

because the loan agreement was between XServe and Aldi, two valid limited liability companies, so that Soderquist and Rivera were not proper defendants nor Dvorkin a proper plaintiff. Soderquist also argued that plaintiffs' claim that Dvorkin was a member of XServe was unsupported by documentation and contradicted by the existing documentation.

¶ 63    As to count I, Soderquist noted that the alleged misrepresentations were not made by him but Rivera and Starkey. Also, the loan agreement was a simple loan, not a stake in owning or sharing in the profits of XServe, and thus not a security under the Securities Law. Even if the agreement and promissory note were a security, it fell under exceptions in the Securities Law including that it was not promoted to the general public or sold to 35 or more persons.

¶ 64    As to counts II and III, the contract was between XServe and Aldi so that Dvorkin could not sue on Aldi's rights in count II nor could Soderquist or Rivera be held liable for XServe's contractual obligations under the LLC Act in either count II or III.

¶ 65    As to counts IV and V, no alleged misrepresentations by Soderquist were pled with particularity; that is, they were either alleged to have been made by someone else, were alleged in a conclusory manner, or occurred well after the loan transaction. Also, many of the alleged misrepresentations concerned forecasts of XServe's future performance, while only statements that were false when made are actionable as fraud. The plan duly disclosed that much of the funds raised would be spent on salaries, and the agreement provided that bonuses or distributions up to $375,000 in a year could be paid. The failure to disclose that Soderquist had a criminal conviction that had barred him from the Internet for four years until 2004 did not necessarily contradict that he had 16 years of information technology experience or render any misstatement material, and the allegation that it impacted XServe's ability to obtaining a debt collection license was belied by the allegation that XServe lost its debt collection license when Rivera left—and thus implicitly

that it had such a license before then. Lastly, the alleged misrepresentations were made by Soderquist and Rivera as agents of XServe and thus could not be the basis for a conspiracy claim.

¶ 66    Plaintiffs responded to Soderquist's motion, arguing that he was liable under the Securities Law even if he personally made no misrepresentations because he was involved in the issuance of a security in the form of the loan agreement and promissory note. Plaintiffs reiterated their arguments regarding the Securities Law and their claim that they had a 5% share in XServe's profits. Regarding count IV, plaintiffs argued that fraud was adequately pled in that the alleged misrepresentations were material and plaintiffs should be able to rely on projections by experienced businesspeople. They also argued that Soderquist's conviction was material. Regarding count V, they reiterated their argument from their response to Rivera's motion that they pled an independent cause of action for fraud so that a cause of action for conspiracy would stand. Lastly, plaintiffs noted that the court already rejected the argument that Dvorkin's claims should be dismissed because the loan agreement and promissory note were with Aldi rather than Dvorkin.

¶ 67    Soderquist replied in support of his motion to dismiss. He argued that there was no evidence or allegation that he participated in the sale of a security under the Securities Law. While the complaint alleged that he was XServe's chief information officer, "[t]here is no legal authority that makes a CIO automatically an officer of the corporation," and plaintiffs did not allege "any actions by Soderquist that aided or participated in the transaction until well after the transaction was consummated." Regarding the argument that the loan agreement and promissory note were not a security, Soderquist noted that the second amended complaint referred to an interest-only loan but the loan agreement and promissory note clearly required that the principal be repaid. As to counts IV and V, Soderquist argued that his alleged statements or actions were in or after November 2017, and thus well after the loan transaction of January 2017, and that there can be no conspiracy between a corporation and its agents because a corporation can act only through its agents.

¶ 68     On November 19, 2020, following arguments, the court ruled on the motions to dismiss. It noted that it earlier dismissed counts I, IV, and V without prejudice and that it was evaluating the newly pled facts to determine if they were now adequate to state a claim. Regarding count I, or the Securities Law, the court found that the allegations in the body of the complaint were belied by the attachments to the complaint. In particular, the loan agreement with its integration clause belied the allegation that XServe agreed to pay 5% of its profits but that was not reflected in the loan documents. The court also found "a failure to adequately plead *** a timely election to rescind."

¶ 69     Noting that it had dismissed count IV for failure to plead fraud with specificity, the court found that the facts newly alleged in the second amended complaint were still not pled with sufficient specificity and also found that many of the allegations were contradicted by the exhibits. As to count V, the court found that plaintiffs' failure to properly plead fraud was fatal to their claim of conspiracy to commit fraud. As to whether the complaint should be dismissed with prejudice, the court found that plaintiffs had "not gotten any closer to pleading causes of action for" counts I, IV, and V and would not be able to because "the documents say what they say."

¶ 70     The court therefore granted the motions to dismiss, with prejudice, as to counts I, IV, and V of the second amended complaint. The court noted that counts II and III were still pending but there were no pending claims against Soderquist or Rivera. The court found no just reason to delay appeal or enforcement of its order as to Soderquist and Rivera. This appeal timely followed.

¶ 71                                    III. ANALYSIS.

¶ 72     On appeal, plaintiffs contend that the trial court erred in dismissing with prejudice their claims of fraud, conspiracy to commit fraud, and violation of the Securities Law against Soderquist and Rivera.

¶ 73     As a threshold matter, we note that Soderquist and Rivera have asked us to dismiss this appeal because the index of and exhibits to plaintiffs' brief do not comply with Illinois Supreme

Court rules, including that the brief does not include a copy of the second amended complaint or the transcript in which the trial court explained its decision. Ill. S. Ct. R. 341 (eff. Oct. 1, 2020), R. 342 (eff. Oct. 1, 2019). However, after the appellee brief was filed, plaintiffs filed with leave of this court an amended appendix that includes a fuller index of the record and copies of the second amended complaint and the transcript of the dismissal hearing. We therefore decline to dismiss this appeal or otherwise sanction plaintiffs for the state of their briefs.

¶ 74                                    A. General Principles

¶ 75     A defendant may file a motion seeking to dismiss a complaint for being "substantially insufficient in law." 735 ILCS 5/2-615(a), (b) (West 2018). The court may "terminate the litigation" or "permit or require pleading over or amending." *Id.* § 2-615(d). A motion to dismiss pursuant to section 2-615 challenges the legal sufficiency of the complaint by claiming that it is defective on its face. *Mullins v. Evans*, 2021 IL App (1st) 191962, ¶ 25. The issue is whether the allegations in the complaint, viewed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. *Id.* In considering a section 2-615 motion, all well-pled facts in the complaint and all reasonable inferences that may be drawn from them are taken as true. *Id.* An exhibit attached to a complaint is incorporated into the complaint, and the exhibit controls if an exhibit and allegations in the complaint contradict. *Feis Equities, LLC v. Sompo International Holdings, Ltd.*, 2020 IL App (1st) 191072, ¶ 50. Conversely, a court may not consider affidavits or other evidence that were not incorporated into the pleadings as exhibits. *Mullins*, 2021 IL App (1st) 191962, ¶ 33. Our review of the trial court's decision on a section 2-615 motion is *de novo*. *Id.* ¶ 25.

¶ 76                                    B. Securities Law

¶ 77    Plaintiffs contend that count I, alleging violations of the Securities Law by Soderquist and Rivera, was erroneously dismissed with prejudice. Soderquist and Rivera respond that the trial court correctly concluded that the promissory note was not a security under the Securities Law.

¶ 78    It is a violation of the Securities Law for anyone:

"A. To offer or sell any security except in accordance with the provisions of this Act[,]

* * *

F. To engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof[,]

G. To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[,]

H. To sign or circulate any statement, prospectus, or other paper or document required by any provision of this Act or pertaining to any security knowing or having reasonable grounds to know any material representation therein contained to be false or untrue[, or]

I. To employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly." 815 ILCS 5/12 (West 2018).

"Every sale of a security made in violation of the provisions of this Act" is voidable at the purchaser's election and

"the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer, Internet portal, or salesperson who shall

have participated or aided in any way in making the sale, and in case the issuer, controlling person, underwriter, dealer, or Internet portal is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making the sale, shall be jointly and severally liable [for the amount paid plus interest, attorney fees, and costs]:

(1) ***[L]ess any income or other amounts received by the purchaser on the securities ***[.]" *Id.* § 13(A).

¶ 79    The Securities Law defines a "security" quite broadly to include "any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, *** or, in general, any interest or instrument commonly known as a 'security.' " *Id.* § 2.1. However, it also establishes various exceptions and exemptions to what constitutes a security and provides that:

"All securities *except those set forth under Section 2a of this Act, or those exempt under Section 3 of this Act, or those offered or sold in transactions exempt under Section 4 of this Act, or face amount certificate contracts required to be registered under Section 6 of this Act, or investment fund shares required to be registered under Section 7 of this Act*, shall be registered either by coordination or by qualification, as hereinafter in this Section provided, prior to their offer or sale in this State." (Emphasis added.) *Id.* § 5.

¶ 80    In particular, this court has held that a promissory note under which the plaintiff was solely a "passive lender" who "did not look to profit from the transaction other than by its ordinary *** charges for lending money" was not a security under the Securities Law. *Boatmen's Bank of Benton v. Durham*, 203 Ill. App. 3d 921, 927-28 (1990). Illinois courts "have emphasized that a security within the meaning of the securities laws is a contract, transaction or scheme whereby one person invests his money in a common enterprise on the theory that he expects to receive profits

solely from the efforts of others." *Id.* at 927; see also *Van Dyke v. White*, 2019 IL 121452, ¶ 51; *Daleiden v. Wiggins Oil Co.*, 118 Ill. 2d 528, 538 (1987) (reciting the same test).

¶ 81    Here, plaintiffs contend that the trial court erred in dismissing count I of the second amended complaint with prejudice because they duly alleged that they expected to receive profits from the efforts of others, in the form of a 5% share in XServe's net profits, and the allegations must be accepted as true for purposes of a motion to dismiss. However, the loan agreement and promissory note that plaintiffs attached to the complaint and incorporated therein belie those allegations in the body of the complaint. Nowhere in the agreement or note is there any provision for either plaintiff to receive any percentage of XServe's profits, gross, net, or otherwise, and the "entire agreement" clause in the loan agreement provides that it, the promissory note,

> "and any attached schedules and exhibits contain the entire agreement of the Parties hereto with respect to the matters covered and the transactions contemplated hereby, and no other agreement, statement or promise made by any Party hereto, or by any employee, officer, agent or attorney of any Party hereto, which is not contained herein will be valid or binding."

¶ 82    The only indication in these documents that plaintiffs invested in XServe rather than lending it money are the recitations that "Lender is a member of" XServe and "an individual residing in the state of Illinois." However, the loan agreement clearly identifies the Lender in two places as Aldi, which is not an individual but a limited liability company. Similarly, the incomplete placeholder for the Lender's name in the initial paragraphs of the agreement and note shows that there were clear cut-and-paste errors in the preparation of these documents. Moreover, the recitation continues that the Lender "has agreed to *loan* money to [XServe] to fund its ramp up and operations, subject to the terms of this Agreement" (emphasis added), and no other provision of the agreement or note reflects that it concerns an investment for profits rather than a loan for

interest. Plaintiffs argue that "the lack of the membership agreement at pleadings stage does not bar the allegation that a membership interest was being sold along with the promissory note." However, in light of all the aforesaid, including the "entire agreement" clause in the loan agreement and the reference in the promissory note to only the loan agreement, we find that there was no "membership agreement" to be attached to the complaint or indeed any oral membership agreement concerning plaintiffs. To be blunt, plaintiffs have seized upon a cut-and-paste error that will not bear the great weight they put upon it.

¶ 83    In sum, we find that the trial court did not err in concluding that the loan agreement and promissory note were not a security under the Securities Law despite the allegations in the body of the complaint to the contrary. Thus, the court did not err in dismissing count I of the second amended complaint purportedly raising claims under the Securities Law.

¶ 84                               C. Fraud and Conspiracy to Commit Fraud

¶ 85    Plaintiffs contend that counts IV and V of the second amended complaint, alleging fraud and conspiracy to commit fraud, were erroneously dismissed with prejudice because they sufficiently pled those causes of action. Soderquist and Rivera respond that plaintiffs did not plead those causes of action with adequate specificity, certain allegations are contradicted by the exhibits to the complaint, projections of future performance are not actionable, the "entire agreement" clause of the loan agreement precluded plaintiffs from relying upon promises not reflected in the loan agreement and promissory note, and there cannot be a conspiracy between XServe on one hand and Soderquist and Rivera on the other because XServe as a limited liability company could act only through its agents.

¶ 86    The elements of common-law fraud are (1) a false statement of material fact by the defendant, (2) who knew that the statement was false, and (3) who intended to induce the plaintiff to act in reliance on the statement; (4) that the plaintiff reasonably relied upon the truth of the

statement; and (5) that the plaintiff suffered damage as a result of action in reliance on the statement. *Castlerigg Master Investments, Ltd. v. AbbVie, Inc.*, 2021 IL App (1st) 200527, ¶ 20. Fraud-based claims are held to a higher standard of pleading, as there must be specific allegations from which fraud is the necessary or probable inference, including what representations were made, when they were made, who made them, and to whom they were made. *Id.*; *Feis Equities*, 2020 IL App (1st) 191072, ¶ 53.

¶ 87     A plaintiff pleading fraud must allege facts sufficient to establish that his or her reliance on the alleged misrepresentations was reasonable or justified in light of all the facts the plaintiff knew and the facts the plaintiff could have learned by exercising ordinary prudence. *First Mercury Insurance Co. v. Ciolino*, 2018 IL App (1st) 171532, ¶ 39. An individual is assumed to have read and understood the terms of a contract that he or she has entered into; that is, a competent adult is charged with knowledge of and assent to a document he or she signs and ignorance of its content does not avoid its effect. *Id.* ¶ 41.

¶ 88     Fraud claims cannot be based on a matter of opinion; that is, a statement of the maker's judgment as to quality, value, or similar matters as to which opinions may be expected to differ. *Abazari v. Rosalind Franklin University of Medicine & Science*, 2015 IL App (2d) 140952, ¶ 19. Promissory fraud, or a promise of future intent or conduct, is generally not actionable in Illinois; that is, misrepresentations alleged in a fraud claim must be of preexisting or present facts. *Id.* ¶ 15. There is an exception for false promises or misrepresentations of future conduct that are "alleged to be the scheme employed to accomplish the fraud." *Henderson Square Condominium Ass'n v. LAB Townhomes, LLC*, 2015 IL 118139, ¶ 69.

¶ 89     Concealment of a fact is actionable as a fraudulent misrepresentation if the concealed fact was material and the person who concealed it was under a duty to disclose it to the plaintiff. *Cahnman v. Timber Court LLC*, 2021 IL App (1st) 200338, ¶ 75. The circumstances under which

such a duty arises include when a plaintiff and a defendant are in a fiduciary or confidential relationship; that is, where the plaintiff places trust and confidence in the defendant so that he or she is in a position of influence and superiority over the plaintiff. *Id.* This position of superiority may arise from friendship, agency, or experience. *Id.* A plaintiff seeking to prove that concealment of a fact was a fraudulent misrepresentation must show (1) concealment of a material fact; (2) that was intended to induce a false belief, under circumstances creating a duty to speak; (3) that the plaintiff could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) that the concealed information was such that the plaintiff would have acted differently had he or she been aware of it; and (5) that the plaintiff's reliance led to his or her injury. *Id.* ¶ 76.

¶ 90    The elements of civil conspiracy are (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act. *Mullins*, 2021 IL App (1st) 191962, ¶ 54. Conspiracy is rarely susceptible to direct proof and may be established by circumstantial evidence, along with inferences drawn from evidence and common-sense knowledge of the behavior of persons in similar circumstances, but that evidence must be clear and convincing. *Id.*

¶ 91    Here, we find that, when plaintiffs' allegations in the body of the second amended complaint are considered in light of the exhibits attached to the complaint, plaintiffs have failed to plead facts (1) from which fraud is the necessary or probable inference, or (2) that show that their reliance on alleged misrepresentations was reasonable or justified.

¶ 92    Firstly, there is the "entire agreement" clause in the loan agreement. Admittedly, it is not an express denial that plaintiffs are relying on promises outside the written agreement as in *Kim v.*

*Song*, 2016 IL App (1st) 150614-B, ¶¶ 29, 49. Nonetheless, an ordinarily prudent person would at least be given pause by a provision that any "agreement, statement, or promise" not included in the loan agreement and promissory note, including promises made "by any employee, officer, agent or attorney" of XServe, are not "valid or binding." Moreover, as touched upon above (*supra* ¶¶ 81-82), the loan agreement and promissory note, in light of the "entire agreement" clause, refute the allegations regarding plaintiffs having a 5% share in the net profits of XServe.

¶ 93     Furthermore, the exhibits to the complaint include XServe's business marketing plan, which plaintiffs allege they received from Starkey in late October 2016. While the plan does not contradict the allegation that "Xserve would be able to generate *sales* in excess of $2,842,847 in the first year" (emphasis added), the plan projected in the very same table that, after expenses, there would be a loss rather than a profit that year. We accept as true the allegation that "Xserve did not purchase any debt with the money and instead used the funds to pay their salaries and expenses." However, in light of the plan, that allegation does not establish fraud as a necessary or probable inference. The plan was clear that XServe was going to *service* loans for others as a contractor or subcontractor and provide support services and consultancy. Nowhere in the plan was it stated that XServe was going to purchase loans or that plaintiffs' funds were going to be used to buy loans. Moreover, while the plan does not contradict the allegation that "the funds would be used solely to fund [XServe's] operating expenses," the plan repeatedly disclosed not only that the operating expenses to be financed from the $1 million included salaries but that most of the funds raised would be for salaries. While we must accept as true the allegations that Starkey and Rivera told Dvorkin they would be buying student loan debt and that operating expenses consisted of the cost of those purchases, a reasonably prudent person would have learned otherwise from the plan and would not have reasonably or justifiably relied on those statements.

¶ 94    Lastly, plaintiffs made two allegations of allegedly material omissions. The first is that defendants failed to disclose Soderquist's criminal conviction and suspension from the Internet over a decade earlier. The second is that Abernethy left XServe between the signing of the loan agreement in January 2017 and plaintiffs sending the money to XServe in late February 2017. However, as stated above, concealment or failure to disclose is actionable as fraudulent misrepresentation only if there was a fiduciary or confidential relationship creating a duty to disclose. While defendants claimed years of business experience and plaintiffs alleged that Dvorkin "is not in the business of lending money," plaintiffs also alleged that Dvorkin "operates a plumbing contractor" and was "nearing retirement age." In other words, he was not inexperienced in business. We find that plaintiffs failed to allege facts establishing that Soderquist or Rivera was in a position of influence and superiority over plaintiffs that would render alleged failures to disclose actionable as fraud.

¶ 95                                    IV. CONCLUSION.

¶ 96    Accordingly, we affirm the judgment of the circuit court for defendants Soderquist and Rivera on counts I, IV, and V of the second amended complaint and remand for further proceedings on the remaining counts of the second amended complaint, counts II and III against XServe.

¶ 97    Affirmed and remanded.

---

**No. 1-20-1368**

---

| | |
|---|---|
| **Cite as:** | *Dvorkin v. Soderquist*, 2022 IL App (1st) 201368 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CH-3566; the Hon. Pamela McLean Meyerson, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | O. Allen Fridman, of Northbrook, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Adam A. Hachikian, of Fox Swibel Levin & Carroll LLP, and Jacob J. Meister, of Jacob Meister & Associates, both of Chicago, for appellees. |

---